**DITTMORE–FREIMUTH CORP.**

v.

**The UNITED STATES.**

No. 182–64.

United States Court of Claims.

Feb. 16, 1968.

J. Kenneth Baird, Milwaukee, Wis., attorney of record, for plaintiff.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARA-MORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

SKELTON, Judge.

Plaintiff, by this action, seeks an equitable adjustment for additional costs it incurred in the performance of four contracts [1] entered into with the defendant for the manufacture of rocket launcher adapters [2] and spare parts. The adapter was designed for attachment to a rocket launcher (hereinafter referred to as the combo) in order to adapt the combo for the launching of sub-caliber rockets from naval aircraft.

More particularly, plaintiff alleges that the Government did in fact and in law authorize or compel changes in the applicable drawings and performance requirements, but has failed to compensate plaintiff for the resultant increased costs as required by the contract. In this connection, plaintiff also seeks reimbursement for extensive delays in the delivery of the adapters during which time its plant and personnel were idle.

Although this assertion is the foundation for plaintiff's grievance, it also advances claims for the costs expended (1) in obtaining the most current Government drawings, (2) in conducting tests at a Government-designated facility rather than at the contractor's plant, and (3) in rebutting the contracting officer's initial decision including, those costs for preparing and conducting the present litigation. For convenience, these claims will be considered in separately numbered portions of the opinion after the recitation of the facts.

Plaintiff alleged unsuccessfully before both the contracting officer and the Armed Services Board of Contract Appeals (hereinafter referred to as ASBCA or Board) that it was entitled to an equitable adjustment under the Changes Article of the contracts for extra costs, the bulk of which involved retooling expenses allegedly incurred as a result of performance tests which plaintiff asserts were in excess of the requirements of the specifications. In its opinion, the

---

1. Contract No. N383s–89240 was awarded on April 30, 1953, pursuant to formal advertising and called for the manufacture of 15,110 adapters at a total cost of $222,533.37 as modified; contract No. N383s–90295 was a negotiated contract entered into on June 9, 1953, for the manufacture of spare parts at a total cost of $18,931.54; contract No. N383s–94105 was a negotiated contract entered into on September 29, 1953, for the manufacture of an additional 4,465 adapters at a total cost of $75,279.90; contract No. N383s–4617A was awarded on June 28, 1954, pursuant to formal advertising and called for the manufacture of an additional 5,000 adapters at a total cost of $84,300. For convenience herein, the sec-

ond contract above for spare parts is sometimes disregarded and the other contracts are referred to as "first", "second", and "third" contract in the order of date of award.

2. Specification SR–142 provides:
 D–1. *Definitions of Terms.*
 * * * * *
 D–1b. *Rocket Launcher Adapter:* A rocket launcher adapter is a device for suspending and releasing sub-caliber rockets from the standard aircraft rocket launcher installation. It shall be designed to adapt to current rocket launchers and to fire sub-caliber rockets by the existing rocket firing circuits.
 * * * * *

ASBCA found that the tests were authorized by and in accordance with the contracts, that the adapters could have been successfully manufactured under the existing plans and specifications and that the Government did not directly or indirectly change the contracts.[3]

On June 15, 1964, plaintiff filed its petition in this court. Trial Commissioner Richard Arens, to whom this case was referred pursuant to order of the court under Rule 57(a), also concluded that the plaintiff's claims must be denied. He, however, did not consider the merits of the case because he found that the plaintiff did not give notice to the Government as required by the contract and because the extra work was not authorized by the defendant. While lack of notice or protest is generally a good defense to such an action as this, there is an old line of cases holding that this defense is not well taken where the contracting officer and the Appeals Board considered the claim on its merits without any point being made as to lack of notice or protest. E. g., Fox Valley Engineering, Inc. v. United States, 151 Ct. Cl. 228, 237–238 (1960). In all fairness to the commissioner, however, and although this issue was technically raised before him, none of the cases supporting this rule were brought to his attention by either party. While we have derived much benefit from his factual presentation, the merits of the case must be considered by us.

The only evidence before the court is the administrative record which was received in evidence, following which plaintiff filed its brief and a detailed statement in the nature of an assignment of errors allegedly committed by the Board.[4]

The plaintiff attacks the Board's decision as arbitrary, capricious, unsupported by substantial evidence, and as an incorrect interpretation of the contracts between the parties.

As will be more fully shown, resolution of the controlling issues turns both on questions of fact and questions of law. It becomes our task, therefore, to ascertain whether or not the Board's factual determinations meet the standards contained in the Wunderlich Act, 68 Stat. 81, 41 U.S.C. § 321 (1964), and whether or not its interpretation of the contract language is correct.

Only a thorough investigation of the facts concerning this complex subject matter will permit the complicated relationship between the parties, upon which this controversy turns, to be properly understood. The summary of the material facts set out in this opinion is based upon the administrative record and the Board's decision. In those instances where we relate facts and the Board has made no corresponding factual determination, our analysis is supported either by uncontradicted evidence found in the administrative record, or by evidence of such a nature that as a matter of law the Board could have made only one finding of fact. Preliminarily we state that from the standpoint of the constructive change order contention which reflects the main thrust of the plaintiff's petition, the ASBCA determinations were not factually or legally in error. The facts underlying the present dispute are as follows:

In March 1953, the invitations for bids (IFB) on contract No. N383s–89240 for the manufacture of 15,110 Rocket Launcher Adapters were issued by the defendant through the Aviation Supply Office, Department of the Navy. The bid package only provided that the item should conform to Bureau of Aeronautics Drawing BUA–49A219H1, dated October

---

3. ASBCA No. 5829, dated August 20, 1963. The proceedings before the Board dealt only with entitlement, with the amount of recovery, if any, reserved. Board Member Taylor, who presided at the hearing, passed away in June 1963, prior to entry of decision.

4. This procedure had been sanctioned previously, United Contractors v. United States, 368 F.2d 585, 593, 177 Ct.Cl. 151, 157 (1966), and cases cited, but under Rule 96, as set forth in Chapter XVIII, captioned "Wunderlich Act Reviews," effective June 1, 1967, the method of proceeding is now explicitly set forth.

26, 1949. Although the defendant inadvertently neglected to incorporate by reference specification MIL–A–6760A, dated July 20, 1951, which by its terms referenced restricted specification SR–142, these test specifications were enclosed in the package transmitted to the contractors.

The plaintiff, Dittmore-Freimuth Corporation, with its principal office in Milwaukee, Wisconsin, filed its bid under date of March 31, 1953, after considering the applicability of both omitted test specifications and was the low bidder.

On or about April 1, 1953, Mr. Maurice Rudin, Supervisory Procurement Agent of the Navy Aviation Supply Office, (ASO) in Philadelphia, Pennsylvania, telephoned plaintiff and the bid was confirmed. Then, sometime during the middle of April 1953, Mr. Rudin indicated to the plaintiff that he intended to cancel the IFB since he considered that the inclusion of specification MIL–A–6760A was a necessary and integral part of the contract, and its omission rendered the invitation for bid incomplete. The record indicates that Mr. Rudin's action was precipitated by a letter to him dated April 13, 1953, from the Firecraft Corporation,[5] which had manufactured the adapter on a prior contract and

5. During our conversation of last Wednesday, April 8, 1953, relative to our price quoted on the above invitation and the various cost factors entering into the manufacturing cost of this item, it was brought out that the original procurement for this product was classified and that prior Invitation No. R–4478–A specified that the Adapters were to be furnished in accordance with specification MIL–A–6760 (Aer) dated June 22, 1950 and further that the Adapter Assemblies were to be in accordance with Bureau of Aeronautics Drawing BUA–49A219H1 and the various detailed drawings. However, the current Invitation No. F54,493 under Item 103–1.1 Specifications merely required the articles to be furnished to conform to the requirements of the specification and/or drawings listed, but that only the Bureau of Aeronautics Drawing No. BUA–49A219H1 was listed. The MIL–6760 (Aer) specification was not listed as being one of the requirements for the manufacture of this product under this latter invitation.

Since our company had just recently completed the successful manufacture of twenty thousand units of this item under the prior Invitation No. R–4478–A (Contract No^a(s) 51–505a) we were naturally aware of the presence of these specifications, MIL–A–6760 (Aer). Also, the fact that this latter specification included Restricted Specification SR–142. Also that on March 22, 1951 an additional specification requirement limiting the latch mechanism release to within the limits of 125 to 175 lbs. per Are–73 letter, No. 28017, was issued. Our price for the manufacture of this second group of units included the additional work and requirements covered by all of these specifications even though said specifications were not stipulated in the invitation as being a requirement for the manufacture of this latter group of units.

In other words, because of our knowledge of the existence of the various aforementioned specifications, our price included fulfilling their severe requirements and upon our furnishing workable or functioning units. The other bidders without this prior knowledge and experience could only bid on the fabrication and assembly of parts in accordance with the Bureau of Aeronautics Drawing BUA–49A219H1. This would result in a so-called inert or malfunctioning assembly which while being made in accordance with the drawings would not begin to produce the functions or comply with the severe service requirements covered by these specifications.

An example of some of these severe specification requirements are; vibration test for a total of nine hours (3 hours in each axis), latch spring test, electrical continuity, installation test, overload test, icing condition, life test, impact test, sand condition, salt spray test and a test of the rocket release mechanism. The failure of any test sample unit to pass inspection and the tests outlined in the specifications is cause for rejection of all production units represented by that sample.

It must be understood that parts even though manufactured in strict accordance with the detailed drawings and within the tolerances shown thereon will not necessarily perform the functions required by the specifications because a slight variation even within the tolerance of the thickness of the Detent Spring Leaves and the thickness of the plating on the Adapter Detent itself can cause the assembly to fail to pass the test and inspection until certain adjustments and

which had been a high bidder on the contract herein involved. The letter, which is set out in footnote 5, supra, in pertinent part, related to the fact that Firecraft computed its bid on the basis of all specifications and modifications since it had recently completed the manufacture of such an item. The letter concluded with the statement that its bid was "the only one qualified to receive serious consideration." As will be seen later, plaintiff places great emphasis on this communication.

Having learned of this possible cancellation, plaintiff's president, Mr. Ray Dittmore, promptly flew to Philadelphia on April 20, 1953, and spoke with Mr. Rudin for several hours attempting to convince him that the inclusion of the test specifications in the contract would not constitute a material change, and stating that he was willing to accept a preaward amendment without any increase in cost to the Government. Mr. Rudin, however, was of the opinion that failure to include the test specifications would result in the purchase of a completely different item than intended. Mr. Dittmore then requested to see Commander Blackman, head of the Purchase Division at ASO.

On April 21, 1953, Mr. Dittmore, during a conversation with Commander Blackman, indicated that the tests contained in the omitted specifications, if performed in accordance with their terms and his understanding, would not constitute a material change in the contract or in the cost of performance of the contract. Commander Blackman agreed with this explanation of why the inclusion of the specification did not change the item.

However, specification MIL–A–6760A provided:

 \* \* \* \* \*

4.4.2.1 In addition to the Individual tests, each production lot sample shall

be tested in accordance with the *applicable* portions of Specification SR–142. \* \* \* [Emphasis supplied.]

 \* \* \* \* \*

It appears that a major portion of the discussion centered around which tests contained in SR–142 would be "applicable." The parties concluded that the Destructive Vibration Test, Latch Test, and the Life Test would be applicable.

With respect to these tests, Specification SR–142 provided:

A. *Preamble and Applicable Specifications*

 A–1. *Preamble:* The laboratory tests contained herein are intended for use in determining the suitability of rocket launchers for service use on Naval Aircraft.

 \* \* \* \* \*

F–7b. *Destructive Vibration Test:* Upon completion of the tests specified in paragraph F–7 herein, the item shall be vibrated in each of its three principal axes, in turn, for a total of nine hours (three hours in each axis). Vibration shall follow approximately a simple harmonic motion and the frequency shall be maintained at 3000 cycles per minute. The amplitude shall be 0.03 inch (total displacement of 0.06 inch). Any electrical or mechanical failure, or the mechanical loosening of any part, during the test, shall be considered failure of the unit to pass the test.

 \* \* \* \* \*

F–10. *Latch Test.*

 F–10a. *Launcher Latch Test:* An inert loaded rocket of the largest size specified shall be placed on the launcher (rigidly mounted), and the following tests shall be made:

 \* \* \* \* \*

 F–10a(2). *Latch Spring Test:* The latch spring shall be required to hold

---

changes in specific components have been made.

In view of the fact that our bid is the only one that includes *all* of the manufacturing, testing and inspection requirements, including that of delivery, and also because of our extensive experience and tooling available from the first production run of units made by our company, we believe our bid is the only one qualified to receive serious consideration by your procurement office.

the rocket under a 200 pound force applied horizontally forward on the rocket when the mechanism is in the released or unlocked position.

\* \* \* \* \*

F–13. *Life Test:* The item shall be latched and operated electrically for 500 cycles of operation at the minimum voltage. The rate of conducting the test shall be such as not to overheat the magnetic coils. The item may be further required to launch up to 200 live rockets without malfunction.

\* \* \* \* \*

The parties further agreed at this time that "the latch mechanism release shall be limited to within the limits of 125 to 175 lbs."

Mr. Dittmore testified that when he observed that there was no release pressure designated with respect to the Life Test, he suggested that one be inserted. The Commander suggested that Mr. Dittmore rewrite the specification, but the latter felt that this was the defendant's duty. Subsequent events show that a revision or addition was never accomplished.

Further testimony revealed that each of the tests set out above was discussed in a few minutes, and there was no mention of whether or not the Latch Test readings would be averaged or recorded individually. Mr. Dittmore did feel, however, that an agreement was reached concerning the method of conducting the Vibration Test—that the item would be clamped to the vibration table at one frequency to see if the parts would come loose. The meeting concluded with Commander Blackman's direction to Mr. Rudin not to cancel the IFB.

Plaintiff reflected its oral agreement with defendant by a letter dated April 27, 1953, to ASO, in which it agreed to furnish the articles in conformity with specification MIL–A–6760A and with the only other preaward modification "limiting the latch mechanism release to within a limit of 125 to 175 pounds," without affecting the bid price.

Thereupon, under date of April 30, 1953, the plaintiff was awarded contract 89240, which now included both modifications previously referred to on page one of the Award Sheet. It read as follows:

*Specifications:*

The articles to be furnished shall conform to the requirements of Bureau of Aeronautics Drawing, BUA–49A219H1 dated 26 October 1949, and specification MIL–A–6760A dated 20 July 1951. The latch mechanism release shall be limited to within the limits of 125 to 175 lbs.

It should be noted at this time that Commander Blackman was not produced at the trial, nor was any explanation offered for his failure to appear. It follows that careful consideration should be given to Mr. Dittmore's version of this conversation. However, it is also of significance that the only written record of what emerged from this conversation is the modification noted on the award of contract 89240. Keeping the above analysis in mind, we turn to the subsequent events of the controversy.

During May 1953, plaintiff's engineering department found, and defendant concedes, that the adapter would not function properly if made per the furnished drawings (BUA–49A219H1 dated October 26, 1949). Plaintiff learned that a previous manufacturer (Firecraft) had prepared a set of drawings, and attempts were made to secure these in May and June 1953.

In connection with the discrepancies that were discovered in the drawings, Mr. Dittmore telephoned ASO, and finally went there in May 1953, to remedy the situation. They unsuccessfully attempted to obtain the necessary information, and Mr. Dittmore returned to ASO on June 3, 1953. On the occasion of this visit he was referred to the Bureau of Aeronautics in Washington, D. C.

On June 4, 1953, Mr. Dittmore personally arrived in Washington and received no cooperation from personnel at the Bureau in obtaining the most recent drawings. Finally, through the efforts

of his senator, a set of the Firecraft drawings were secured.

On June 9, 1953, Mr. Dittmore returned to Washington to clear up some miscellaneous points, and the data he requested were promptly furnished by the Bureau.

Although the legal ramifications will be considered later on, it is for the sake of clarity that we mention that it is only the travel expenses of these two trips to Washington which comprise this portion of plaintiff's claim. It is also of interest to note the fact that plaintiff had no intention at that time to file a claim for the expense incurred in obtaining the latest drawings.

Plaintiff then incorporated all this information in its own shop drawings which it submitted to Mr. Lee Morgan, project engineer at the Bureau of Aeronautics. Mr. Morgan approved the drawings and plaintiff agreed to manufacture the item without additional cost to the Government. This agreement was reduced to writing, evidenced by correspondence from plaintiff dated June 23, 1953, and the written approval dated July 6, 1953, from the Bureau.

In the meantime, plaintiff entered into contract 90295 with defendant on June 9, 1953, and on September 29, 1953, it entered into contract 94105 for the manufacture of additional adapters.

On November 17, 1953, plaintiff was advised by the defendant to forward its preproduction samples to the University of Pittsburgh for testing. In order to conserve time, Mr. Dittmore and plaintiff's Chief Consulting Engineer, Mr.

Richter, personally carried the first five samples to the test laboratory on November 18, 1953.

Tests were performed during the next two days, following which plaintiff was informed, on November 20, 1953, that the units had failed the vibration tests. Consequently, more samples were flown to Pittsburgh on November 21, 1953. On December 2, 1953, Mr. Dittmore was notified that the second set of samples also failed the vibration tests.

Mr. Dittmore, his curiosity sufficiently aroused as to why the units were failing, boarded an airplane on December 3, 1953, and accompanied the final three samples to the testing facility. On the occasion of this visit, Mr. Dittmore was informed by the testing personnel that they were conducting the vibration test by attaching a combination bomb rack and rocket launcher (the "combo") [6] to the bottom of the vibration table to simulate actual flight. The adapter was then fastened to the bottom of the "combo" by its regular mounting points, and a practice rocket was placed on the adapter half of the time during the test. Mr. Dittmore was further told that the units were then vibrated without the utilization of sway braces,[7] and the lughead of the adapter was breaking off resulting in the failure.

Mr. Dittmore testified that his reaction at this time was that the vibration test should be performed by "grabbing" the item firmly by its main frame, close to the center of gravity, and shaking it to see if any parts come loose. But, if the adapter was going to be attached to a "combo", sway braces should definitely be used. In testifying before the ASBCA

---

6. Specification MIL–A–6760A provides:

\* \* \* \* \*

1. SCOPE

1.1 \* \* \* This adapter is suitable for carrying and launching 2".25 Sub-Caliber Aircraft Rockets (hereinafter abbreviated SCAR), and is intended for use with the Combination Bomb Rack and Rocket Launcher Aero 14A.

In one part of a narration of the facts, the ASBCA erroneously states: "Upon inquiry as to how the tests were conducted, the appellant's president

learned that the University had attached each of the adapters to the vibration table by fastening it at the mounting points. The appellant's president objected to this method of testing because the adapter was designed for attachment to a combo." Subsequently, in its opinion, however, the ASBCA, in defining the issues, correctly interprets the positions of the parties respecting the vibration test.

7. Sway braces are also used in actual flight.

regarding the vibration test, Mr. Dittmore stated:

> Well, when I was told how they were doing it, then my reaction to them was, well, at least, if you are going to use your normal mountings, which is all right with us, provided they are very rigid mountings, at least you should have used your sway braces. That will tend to make this a firm mounting then.

It was his opinion, however, that even with sway braces the test was still not satisfactory. In this connection, he stated that the item was not moving in a simple harmonic motion and that performing the test with sway braces would not cure the defect. It was Mr. Dittmore's further objection that the test did not require a rocket.

At this same meeting, Mr. Dittmore was informed that the laboratory, in performing the Latch Test, was taking individual pressure readings of the release mechanism rather than averaging the readings. It was also gathered from the discussion that during the Life Test of 500 releases, periodic pressure readings were being taken of the force of each release. Mr. Dittmore testified that he was somewhat surprised since nowhere had the permissible release range been stipulated in connection with the latter test.

The laboratory personnel and the contractor's president could not agree whether to use sway braces in the performance of the vibration test and accordingly decided that they would telephone Mr. Lee Morgan which they did on December 3, 1953.

It is this disputed telephone conversation which forms the crux of the present controversy. The plaintiff's account of what occurred is as follows:

Mr. Dittmore advised Mr. Morgan that, in his opinion, the adapter itself should be attached directly to the vibration table with straps at or near its center of gravity and vibrated. He further indicated that the test was not being performed properly under the terms of the specification, because the latter required that the adapter itself acquire a sine wave of the same frequency and amplitude as that of the vibration table. Mr. Morgan is said to have rejected this suggestion stating that the purpose of the test is to duplicate field conditions.

Mr. Dittmore stated that he responded by urging that the test be conducted with sway braces so that the adapter would be more rigidly held during performance of the vibration test. Mr. Morgan agreed that the test should be run in this manner.

A further proposition by plaintiff to redesign the mountings was rejected by Mr. Morgan and the testimony shows that it was plaintiff's overall impression that no design changes were desired.

Mr. Dittmore testified that he then brought to Mr. Morgan's attention the fact that even if the test was conducted as above-described, he did not feel that the unit would pass, but if a number of the tolerances provided for on the contract drawings were tightened, enabling the parts to fit together more closely, the item would be successful "most of the time." Mr. Morgan is alleged to have replied, "I want the unit to pass that test, so whatever you are going to do, do it, but I want it to pass that test."

As to the Latch Test, the contractor allegedly advised Mr. Morgan that the contract required only that the average of the readings must fall within the 125–175 pound range. Mr. Morgan is alleged to have insisted that all readings must fall within that range. Mr. Dittmore also testified that, in connection with the Life Test, he commented to Mr. Morgan that he did not believe that the unit would stay under 175 pounds in attaining 500 releases. The testimony was that Mr. Morgan agreed, but replied that plaintiff should stay as close to the range as possible.

Following this conversation, Mr. Dittmore returned to his plant in Milwaukee and instructed the personnel involved, in early December 1953, that all tolerances would have to be tightened in order to pass the various tests. As a result of

this action, plaintiff discarded various materials, purchased new materials and instituted additional inspection procedures to insure and enforce the closer tolerances in manufacture and assembly of the adapter. Mr. Dittmore stated that even though he was not aware of any Latch Test failures as of this time, he could anticipate failures since the test was being conducted improperly. The fact that defendant was going to insist that every reading be within the limits of the release range, was offered as an additional reason for narrowing the tolerances.

The observation should now be made that despite the fact that plaintiff had not yet received the test report covering the samples taken to Pittsburgh on December 3, it still proceeded to act on the alleged authority of the telephone conversation of that same date.

Mr. Morgan's version of that telephone conversation is somewhat different. He had no recollection that he intimated or agreed that the adapter would not have to pass the vibration test all of the time. More specifically, he was positive that he did not even discuss waiving performance since that was not done on previous contracts and all prior contractors performed satisfactorily. Although Mr. Morgan did recall a discussion involving tolerances, he did not remember the nature of the problem or when it occurred, but he was certain it did not take place on December 3, 1953. In any event, Mr. Morgan testified that he never told anyone to change tolerances, rework material or purchase new material. To the best of his knowledge, the discussion only concerned whether or not sway braces would be used in connection with the vibration test.

It is noteworthy that Mr. Dittmore never testified that Mr. Morgan authorized him to proceed with the tolerance changes. His most direct statement on this point was that Mr. Morgan's insistence on simulating field conditions necessitated the changes.

Let us now return to the events which followed.

Two of the three samples submitted for testing on December 3, 1953, passed the vibration test with sway braces and plaintiff received an approval to make shipment on December 8, 1953. One unit failed after it had been vibrated 7¾ hours (out of the 9 hours required). When Mr. Dittmore was questioned on cross-examination as to why he instituted all these changes when the adapter successfully passed the test, he responded by stating that he did not consider it unusual since defendant would exercise a great deal of care in performing the test now that a question had been raised.

On December 7, 1953, 16 additional samples were sent to Pittsburgh, which consisted of four adapters for each of the production lots 2, 3, 4, and 5. These were shipped just about the time Mr. Dittmore returned from the meeting at the laboratory and before any tolerances were reworked.

Only two of the samples for lot five failed the vibration test and the report for that failure was received by plaintiff on or about February 1, 1954. The lot nevertheless was accepted without a retest. There was testimony to the effect that since each adapter that was recorded as failing the vibration test came very close to passing, shipment was authorized.

The next failure was not reported until September 7, 1954, and since it too was not rejected, Mr. Dittmore assumed that their alleged agreement, that the item only be required to pass the test "most of the time," was still in effect.

Prior to that time, however, plaintiff was awarded the final contract involved in this litigation, designated N383s–4617A, on June 28, 1954, for the production of still additional adapters.

It was not until September 1955, approximately a year after the last previous failure was recorded, that further vibration test failures were noted on lots 4 and 5 of contract 94105 (the second adapter contract). In this connection, the Inspector of Naval Materiel, (hereinafter referred to as "Inspector") by letter dated September 15, 1955, notified plaintiff

that the lots were rejected and requested plaintiff to furnish new samples. This letter was evidently prompted by a communication to the Inspector from the Bureau of Aeronautics, dated September 8, 1955, in which it was stated:

> \* \* \* \* \*
>
> 2. The Chief of the Bureau of Aeronautics concurs with the Inspector of Naval Material that the contractor's responsibility does not end with the manufacture of parts and assemblies which meet physical dimensions. Since lots four and five failed under vibration tests, these lots must be resampled and tested at the University of Pittsburgh.
>
> \* \* \* \* \*

The Inspector further advised plaintiff, by a letter dated October 5, 1955, that the "adapters *must also pass the required tests*," (emphasis in original) and requested cooperation in ascertaining the reason for failure.

On October 6, 1955, the plaintiff responded and wrote in part:

> We feel that when the laboratory tests were originally set up that the engineers had to intelligently set the tests up so that they *matched* the capabilities of the units as made per the drawings! Therefore, if the units are made per the drawings they *will* always pass the properly defined laboratory tests.
>
> However, if the units are made per the drawings and they will not always pass the laboratory tests, then there is an ambiguity (or a "conflict" as stated in MIL–A–6760A under 6.1); and either the designed drawings must be changed \* \* \* or the laboratory tests must be changed \* \* \*. [Emphasis in original.]

The Inspector replied on October 31, 1955, asserting that the drawings and specifications had equal importance and therefore, an item to be acceptable must agree with both.

The plaintiff then wrote the Bureau of Aeronautics on November 2, 1955, and again attempted to explain its reason for the failures. Plaintiff noted that an examination of the units revealed that

> \* \* \* relative motion between the sway braces and the units must have existed during the test \* \* \*.
>
> \* \* \* \* \*
>
> We are reasonably sure that if these units were subjected to a truly simple harmonic vibration as specified, there would be no difficulty in passing the test. We do not feel that any useful purpose would be served by submitting additional samples because they would not represent any change from previously manufactured lots. They may or may not fail depending on tolerances and other circumstances outlined above.

The plaintiff, however, in the above communication did recognize that the purpose of sway braces is to prevent the relative motion referred to above.

On November 21, 1955, the Chief of the Bureau wrote in reply that he concurred with plaintiff's analysis that the failures were caused by the lack of effectiveness of the sway braces to eliminate relative motion between the test samples and the rack. He concluded by stating:

> \* \* \* Since only one sample from each lot failed the final phase of the vibration test, the Chief of the Bureau of Aeronautics will waive the results of the tests of these samples and accept lots 4 and 5.

A similar incident occurred on the final lot (5) of the last contract. On November 6, 1955, plaintiff received a laboratory report showing a vibration test failure. The Inspector then notified plaintiff of rejection by letter dated November 25, 1955, and requested more samples for retesting. Plaintiff wrote that it could not do more to insure success in the vibration test.

Thereafter, through an exchange of telegrams in the middle of December 1955, between plaintiff and the ASO, the lot was accepted with a written guarantee of test performance by plaintiff.

With respect to the other tests in issue, plaintiff noticed that while the test reports on lots 2, 3, 4, and 5 of the first

adapter contract, did not show the item as having either passed or failed the Life Test, the accompanying notes did reveal that the pressure readings were high in relation to the alleged agreement to stay as close to the release range as possible. As a result, plaintiff then attempted to tighten down under the Latch Release Test sometime in February 1954, although he concedes he was not actually instructed to bring down the Life Test readings.

Its endeavor was successful in the respect that on August 17, 1954, test reports indicated lower Life Test readings, but they also showed that the Latch Test readings were below the specified range.

Then, on September 3, 1954, plaintiff was informed that lots 20 and 21 failed the Latch Test, which incident created several months of confusion. It appears that there was a 30 pound difference in the readings between plaintiff's equipment and the Pittsburgh test equipment, the reason for which, to this day is not resolved. An added complexity was the fact that when the samples were picked for the tests on lots 20 and 21, plaintiff's inspector was ill and rejects were inadvertently selected for testing. This amounted to a 30 pound differential in addition to the aforementioned discrepancy in test equipment. Plaintiff then began to manufacture the units so that release forces were higher, and even though the laboratory reports were lower than plaintiff's, the readings were still within the permissible range. This, however, resulted in higher Life Test readings.

While plaintiff has shown a basis for its conduct with reference to the Life Test, it is significant that none of the adapters were ever rejected for its failure. What is less evident is the reason for plaintiff's course of action where the Latch Test is concerned. Even more obscure is the exact nature of the changes that were undertaken. It should also be pointed out that while the reports did not indicate whether or not the item passed the Life Test, the item successfully passed the Latch Test through Lot Eleven. In any event, the failures that are noted thereafter are attributed to the individual readings taken by defendant rather than an averaging of readings as plaintiff contends.

On December 1, 1955, the plaintiff filed its written request for change orders and equitable adjustments, covering the changes in the specifications and test requirements allegedly required by the Bureau of Aeronautics with ASO.

The contracting officer, on October 17, 1957, issued a "findings of fact and decision" denying the contractor's claim for an equitable adjustment.

Specifically it was found that:

* * * A simple harmonic motion was achieved notwithstanding the lack of sway braces. Compliance with the vibration test by all items is not impossible without redesigning the unit.

Thereafter, plaintiff attempted to prove that this finding was erroneous, and on November 8, 1957, the contracting officer withdrew in its entirety the determination set out in the next preceding paragraph.

After further investigation, special vibration tests were conducted at the University of Pittsburgh in the summer and early fall of 1958, the results of which indicated that in most instances the adapter itself did not obtain a simple harmonic motion during the vibration test.

The plaintiff did agree at this time, however, that a vibration test conducted unloaded (without a rocket) and with sway braces should produce a sine wave in the adapter and would be the type of test that it originally bid on in the contract. Furthermore, plaintiff expressed the opinion that had the test been conducted so that the adapter followed approximately a simple harmonic motion, no changes in the tolerances would have been necessary.

The contracting officer, after consideration of the additional information, again concluded that plaintiff was not entitled to an equitable adjustment.

He stated:

It is the finding of the contracting officer that while the adapter itself may not have received a pure simple harmonic motion, the vibration table and the rocket launcher to which the adapter was attached in the test were actuated in a simple harmonic motion; and that, accordingly, the requirement that the item be vibrated in "approximately a simple harmonic motion" must be reasonably interpreted as requiring a test in the manner performed by the Government.

The board in its decision concluded: [8]

1. The destructive vibration tests as performed by the University after 3 December 1953 were authorized by and in accordance with the contracts;

2. The life test and the latch test as performed by the University were authorized by and in accordance with the contracts;

3. The adapters could have been successfully manufactured under the existing plans and specifications without any tightening of the tolerances or improvement of the latch release mechanism; and

4. The Government did not directly or indirectly change the contracts.

Accordingly, the appeal is denied.

Before addressing ourselves to the specific findings of the Board noted above and the rationale underlying those ultimate findings, we would like to dispose of two claims advanced by the plaintiff and neither considered by the Board nor briefed by the defendant.

### CLAIM 1

*The Cost of Obtaining Current Government Drawings*

This claim pertains to the first contract only. (Complete drawings were received in relation to the subsequent contracts.) As will be recalled, plaintiff seeks reimbursement only for the cost of travel to Washington from its Milwaukee office. In this vein, plaintiff asserts that the uncontroverted evidence reveals that the latest drawings were not furnished by the defendant and that the drawings received by plaintiff were not adequate to make an adapter which would function.

Although plaintiff notes that it is accustomed to finding errors in Government drawings, which fact it considers when preparing its bid, the present claim is predicated on a lack of cooperation on the part of the Government. Plaintiff further says that it was this lack of cooperation which necessitated the "extended visits" to Washington, the expenses of which cannot be thrust into the category of a properly anticipated cost. Whether a fair reading of this contract reveals that the specific dispute has not been committed to agency decision and is to be originally considered in this court, or reveals that a specific provision of the contract renders complete relief and the claim is subject to initial administrative resolution is of no moment since the result would be identical in either instance. As no evidence outside the administrative record has been offered, received, or considered, the facts established by that record guide the outcome of this claim. Again, whether the claim is one for a "pure" breach of contract or is one which arises under the contract, we can make the factual determinations if the evidence is undisputed. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Maxwell Dynamometer Co. v. United States, infra, 386 F.2d 855.

The proper action, therefore, at this juncture would be for this court to resolve plaintiff's allegations on the basis of a reading of the administrative record under the above standard.

The short answer to plaintiff's allegation is that it was only *after* plaintiff's president had secured transportation to Washington and was physically in the Bureau of Aeronautics that he encountered contrariety. Plaintiff had had complete cooperation from the defendant until it arrived in Washington on June 4, 1953. It is noteworthy that the record

---

8. ASBCA No. 5829 (August 20, 1963).

is silent as to why Mr. Dittmore felt his personal appearance on either occasion was compelled. It is safe to conjecture that a different mode of communication would have been less costly and perhaps more rewarding since in his personal visits he seems to have dealt with lower echelon personnel.

It is also significant that plaintiff had no intention of filing a claim at the time the expense was incurred. That admission leads to the conclusion that this item of damage is nothing but an after-the-fact issue. Plaintiff cannot be permitted to transform an expense which is considered customary in the preparation of its bid, into a monetary claim against the Government. The evidence does not establish that the delay in furnishing the necessary amendments to the drawings was of unreasonable duration or that it occasioned plaintiff any significant delay or extra cost in the performance of the contracts. Wunderlich Contracting Co. v. United States, 351 F.2d 956, 173 Ct.Cl. 180 (1965). Accordingly, plaintiff's claim is denied.

## CLAIM 2

*The Travel Expenses Incidental to Tests Conducted at the Pittsburgh Laboratory*

■ Plaintiff again sets forth that it customarily includes as a part of its bid a reasonable figure for the costs of testing and retesting. The theory upon which it proceeds, however, is that the contract provided that all inspection and testing would be performed at the contractor's plant and accordingly, the additional trips and travel expenses arising out of testing at the University of Pittsburgh require extra compensation since it was a change in the contract. It appears that this claim "arises under the contract" and has been committed to agency decision in the first instance. Although the ASBCA did not resolve this question, we have frequently stated that where the Board has failed to make relevant findings of fact as to which the evidence is undisputed, this court can determine the facts rather than referring

the matter to the Board. Maxwell Dynamometer Co. v. United States, Ct.Cl., 386 F.2d 855, decided November 9, 1967. This is precisely the situation here.

■■ While the number of, and reasons for the trips involved are questions of fact, resolution of whether or not the contract required testing to be conducted at the contractor's plant involves an interpretation of the contract documents which is a question of law. And, as stated numerous times, this court may reach an independent judgment on any legal issues. E. g., Perini Corp. v. United States, Ct.Cl., 381 F.2d 403, 409, decided July 20, 1967.

■ All four contracts in the contract *schedule* or on the award pages provide that:

151–4.1 INSPECTION

*Inspection* will be made at Contractor's plant, located at 2517 EAST NORWICH STREET, CUDAHY, WISCONSIN, by the Inspector of Naval Material, 783 NORTH WATER STREET, MILWAUKEE 2, WISCONSIN, who is requested to conduct *inspection* upon notice from the Contractor that the material is or will be ready. [Emphasis supplied.]

*Specification* MIL–A–6760A then provides:

4.2 *Inspecting Agencies.*—The complete adapters together with materials and manufacturing processes used in their construction shall be inspected by authorized Government inspectors at the contractor's plant or elsewhere as directed by the Procuring Service. *Reproduction samples and production samples will be tested by the Naval Activity to be designated by the Bureau of Aeronautics; the contractor will not conduct these tests.* [Emphasis supplied.]

4.3.1 *Sampling Instructions.*—

* * * The preproduction samples shall be delivered for * * * testing as directed by the Procuring Service. * * *

The *General Provisions* upon which plaintiff relies provide:

## 36. ORDER OF PRECEDENCE

*(The following clause shall apply only in the event this contract is preceded by Formal Advertising.)*

To the extent of any inconsistency between the Schedule or the Terms and Conditions of the Invitation for Bids or the General Provisions, and any specifications or other provisions which are made a part of this contract by reference or otherwise, the Schedule, the Terms and Conditions of the Invitations for Bids, and the General Provisions shall control. To the extent of any inconsistency between the Schedule and the Terms and Conditions of the Invitation for Bids or the General Provisions, the Schedule shall control. [Emphasis in original.]

Plaintiff vigorously asserts that a reading of paragraph 36 of the General Provisions, compels the conclusion that the Schedule controls the language of specification MIL–A–6760A.

Disregarding the fact that paragraph 36 only applies in the event a contract is preceded by formal advertising (and two contracts in the instant litigation were not), plaintiff is still confronted with an insurmountable obstacle. Its argument fails to demonstrate any "inconsistency" between the contract provisions—a further prerequisite to employing the clarifying qualities of paragraph 36.

The schedule clearly states that only inspection will be conducted at the contractor's plant, while the specification unambiguously instructs that the "contractor will not conduct these tests." Furthermore, the specification by its clear terms permits testing at a Government-designated facility, which provision does not conflict with any that might be found in the schedule. It is only too obvious that there is no merit in plaintiff's claim.

Further, the record indicates that when the defendant directed the pre-production samples to be shipped to the University of Pittsburgh, plaintiff was under the impression that the contract was being properly interpreted.

██ The court gives great, if not controlling weight to the interpretation placed upon the contract provisions by the parties themselves prior to the time when the contract becomes the subject of controversy. A.R.F. Products, Inc. v. United States, Ct.Cl., 388 F.2d 692, decided December 15, 1967.

Moreover, plaintiff did not acquire a vibrating machine with which to conduct the destructive vibration test until after the completion of the contracts in question. Viewing plaintiff's contention in this light bolsters the conclusion we now reach. Accordingly, plaintiff's claim must ·be denied.

## CLAIM 3

*The Cost of New Tooling and Materials —Delay Damages*

### A. Destructive Vibration Test

While this item approximates 90 percent of plaintiff's claim, it should be noted at the outset that to whatever compensation, if any, plaintiff is ultimately entitled, no recovery is warranted with respect to contract 4617A awarded to plaintiff on June 28, 1954.

██ Mr. Dittmore testified, in response to questions propounded by the presiding Board member, Mr. Herbert D. Taylor, that while he knew of the difficulties encountered with respect to the first three contracts, plaintiff's bid for the fourth contract was computed without making allowance for these alleged "changes" in order to be competitive. It should be reiterated that all the problems were looming large, at least in plaintiff's view, by December 3, 1953. It was plaintiff's duty to mitigate the damages which it now seeks to recover, yet there is no evidence that it contemplated withdrawing its bid, nor is there a showing that it sought to increase its bid. Under these circumstances, plaintiff cannot be shielded by its plea of having to meet competitive bids. See, Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 779, 160 Ct.Cl. 437, 445 (1963).

Having restricted plaintiff's recovery, if any, to the first three contracts, we now consider the key contentions.

 Plaintiff's suit for these additional costs is founded first, on its argument that the ASBCA erred in failing to conclude that the terms of the contracts subordinated the test specifications to the drawings. Plaintiff contends that it initially manufactured the item per the drawings, but the Government's repeated insistence that the item must also pass the referenced tests resulted in an improved product which constituted a change for which an equitable adjustment should be made. Alternatively, plaintiff relies on the doctrine of Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947), that ambiguous contract provisions, susceptible to more than one reasonable construction, will be construed against the Government as the party who drafted the instrument. Neither of these contentions withstands analysis.

As will be recalled, contract 89240, which was preceded by formal advertising, was modified on the face of the award to read:

*Specifications:*

The articles to be furnished shall conform to the requirements of Bureau of Aeronautics Drawing, BUA–49A219H1 dated 26 October 1949, *and* specification MIL–A–6760A dated 20 July 1951. The latch mechanism release shall be limited to within the limits of 125 to 175 lbs. [Emphasis supplied.]

Contract 94105, a negotiated contract, incorporated this same provision in its schedule. Finally, contract 4617A states in its schedule:

103–1.1 SPECIFICATIONS

The articles to be furnished shall conform to the requirements of the Specifications *and/or* Drawings here-

inafter listed which form a part hereof:

Bureau of Aeronautics Drawing BUA–49A219H1, dated 26 October 1949 *and* Military Specification MIL–A–6760A dated 20 July 1951. The Latch Mechanism Release shall be limited within the limits of 125 to 175 pounds. [Emphasis supplied.][8]

It is also to be remembered that specification MIL–A–6760A incorporated by reference the applicable provisions of SR–142 which are the tests in issue here.

Specification MIL–A–6760A reads in pertinent part:

3.5 *Performance.*—* * * The adapter shall perform as required to satisfactorily withstand the tests specified in Section 4.

4.3.2 *Tests.*—The preproduction samples shall be inspected to insure their strict conformance with the *applicable drawings and specifications* referenced herein. * * *. [Emphasis supplied.]

4.4.2.2 *Conformance with Drawings.*—One-half of the production lot samples submitted for each production lot * * * shall be thoroughly inspected for *strict conformance with the applicable drawings and specifications* * * *. [Emphasis supplied.]

The section upon which plaintiff places chief reliance reads as follows:

6. NOTES

6.1 *Compliance with Drawings and Specifications—*

*Conflict Elimination.—*

Inasmuch as the contractor is required by provisions of this specification to comply strictly with the drawings listed in Section 2, it may be impossible due to production processes in some instances also to comply with the performance and test requirements specified herein; the contractor, in that event, shall promptly notify the Bureau of Aeronautics of such fact, and appropri-

---

**8.** Contract 90295 for the furnishing of spare parts does not contain such a provision. Evidently, the inclusion of it was

deemed irrelevant in connection with the manufacture of spare parts.

ate changes will be made in the applicable drawings, parts, or performance requirements as authorized by the Bureau of Aeronautics. An equitable adjustment in accordance with the applicable contract provisions will be made in the price of the articles to be delivered to reflect any change so authorized by the Bureau of Aeronautics.

Plaintiff again cites paragraph 36 of the General Provisions, supra, for the proposition that the referenced tests are inferior to the other contract documents. Although it is willing to admit that "at the first impression the MIL–A–6760A Specifications seem to require that the item be made per the Drawings and in addition that the item be required to pass the applicable tests of SR–142, and all this without any increase in price," plaintiff maintains that § 6.1 of MIL–A–6760A, supra, makes the drawings completely controlling over the test specification SR–142. The basis for this position is that since the latter is a referenced test specification, it cannot override the effect of MIL–A–6760A which states that "* * * the contractor is required by provisions of this specification to comply strictly with the drawings * * *."

The defendant, on the other hand, "concedes that it required plaintiff to comply with the contract drawings as well as the performance specifications, and asserts that the contracts specifically so provided." Defendant further contends that § 6.1 of MIL–A–6760A, does not function to establish an order of precedence, but rather to adjust any conflicts between production processes and test requirements. Finally, defendant says, if the contractor need only comply with the drawings, it is obvious that § 6.1 would be rendered meaningless.

In light of the unambiguous provisions previously set forth, it is apparent that plaintiff assumes a heavy burden indeed in attempting to sustain the contention that it was obliged only to comply with the drawings. After a consideration of plaintiff's contentions, it must be concluded that plaintiff has failed to sustain such burden.

Plaintiff again seeks to utilize the provision (paragraph 36) which can only be employed where the requisite conflict or inconsistency in the contract language can be shown. Its position is riddled with the same imperfections observable in its earlier assertions, that is to say, a fair reading of the provisions previously referred to do not reveal any ambiguity or inconsistency. Again, notwithstanding that its scope is restricted to formally advertised contracts, paragraph 36 of the General Provisions has no application in the present litigation. Nor does § 6.1 of MIL–A–6760A establish an order of precedence. Even by reading the sentence "* * * the contractor is required by provisions of this specification to comply strictly with the drawings * * *" out of context, as plaintiff seems to contend, nowhere can plaintiff find language which negates the requirement that the drawings *and* specifications must be complied with.

The very title of § 6.1, "Compliance with Drawings *and* Specifications—*Conflict Elimination*" [Emphasis supplied] points up the dual requirement injected throughout the contract. Furthermore, the title indicates that it is a provision to eliminate conflict, which when read in its entirety, unmistakably refers to conflict between the drawings and the tests. It does not function to place the drawings in a preferred position.

It has been recognized that most words and phrases can be twisted into an ambiguity by a strained construction, Aero Mayflower Transit Co. v. United States, 162 Ct.Cl. 233, 237 (1963), but the mere fact that the parties disagree as to meaning over the contract terms does not necessarily render the contract ambiguous. Carter Oil Co. v. McCasland, 190 F.2d 887, 891 (10th Cir. 1951). It is the established canon of construction "that contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible." Thompson Ramo Wooldridge, Inc. v. Unit-

ed States, 361 F.2d 222, 228, 175 Ct.Cl. 527, 536 (1966), and authorities cited.

■ It follows that § 6.1, by its own language as well as by general principles of construction, can only be the basis for mediation when the drawings and test specification SR–142 cannot be harmonized. When both cannot be complied with by the contractor, he promptly notifies the Bureau of Aeronautics, which, in turn, authorizes the appropriate changes.

At this stage of the case we do not decide whether or not a conflict existed. We only hold that § 6.1 of MIL–A–6760A does not establish an order of precedence as plaintiff suggests. To hold otherwise would render meaningless the repeated directions in the contract documents that both the drawings and specification requirements must be met. It would only be through a distortion of § 6.1 that plaintiff's position could be sustained. Moreover, if the drawings were controlling, the following unenviable alternatives would be left to the Government: (1) either to run the risk of having to accept and pay for a completely worthless item; or (2) to shoulder the burden of additionally compensating the plaintiff for an item which would function adequately. It is completely unrealistic to assume that such was the intention of the parties and the clear contract language dispels any doubt.

■ Plaintiff's contention that the doctrine of Peter Kiewit Sons' Co. v. United States, supra, is applicable requires little comment. The rule of construction that contract provisions will be construed against the drafter presupposes that a reasonable interpretation is being given to the alleged ambiguous language. "The fact that, by giving words strained or unusual connotations, a certain interpretation might or could be considered is not a proper basis for the application of the rule." Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 84 (1960).

Plaintiff has raised another alternative argument for the court's consideration. Plaintiff urges that if the terms of the contract required that the adapter pass the performance tests as well as comply with the drawings, then the defendant erroneously interpreted, and thus changed the test specifications from those in the original contract entitling the contractor to an equitable adjustment.

The performance tests in dispute were set out previously. What must be considered is whether plaintiff voluntarily reworked tolerances, purchased new materials, and instituted more rigid inspection procedures, or whether defendant actually or constructively compelled such an undertaking. A similar question was recently explored in Gholson Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 173 Ct.Cl. 374 (1965), and it is imperative to recognize that factual as well as legal issues may be encountered.

The Board found as facts that the adapters could have been successfully manufactured under the existing drawings and test specifications without any tightening of the tolerances or improvement of the latch release mechanism and that all the tests were authorized by and performed in accordance with the contracts. Also, intimately connected with the question of constructive change is the finding of the Board that the defendant did not directly or indirectly change the contracts. In other words, implicit in those findings is the fact that the item did satisfactorily withstand the rigors of authorized tests as modified by oral agreement on December 3, 1953, without the need for any improvements.

■ The question whether the adapters were subjected to tests more severe than those required by the contracts is a question of fact. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 262 (1962). There the dispute as to whether tests subsequently required by the defendant were so severe as to require the plaintiff to design a stronger pipe, was characterized as a question of fact. Similarly, the reason an item fails a particular test has been treated as a factual question. T. C. Bateson Constr. Co. v. United States, 149 Ct.Cl. 514, 518 (1960).

Cf. Maxwell Dynamometer Co. v. United States, supra, 386 F.2d 855.

██ An administrative decision as to factual questions is considered final unless it is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. Wunderlich Act, supra.

██ The standard for judicial review of such an administrative determination is discussed in many cases including Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Appalachian Floor Co. v. United States, 144 Ct.Cl. 11 (1958); T. C. Bateson Constr. Co. v. United States, supra, and River Constr. Corp. v. United States, supra. Generally speaking, the evidence has to be such that upon review of the entire record, a reasonable man could have reached the conclusion arrived at by the administrative tribunal. If such a standard is met, this court is precluded from substituting its judgment for that of the agency involved.

██ With respect to whether defendant's performance of the required tests necessitated a change in the manufacture of the adapter, we have found that the Board included an extensive statement of the happenings surrounding this question, and these factual determinations are not fraudulent, or capricious, or arbitrary or so grossly erroneous as necessarily to imply bad faith, and that they were supported by substantial evidence in the record before the Board. Consequently, such factual determinations by the ASBCA are final and conclusive under the Wunderlich Act, supra.

The Board stated:

We find it difficult to understand why the appellant felt compelled to inaugurate a retooling program merely on the strength of the president's apprehension that the units as designed would not pass the test. The fact is that the appellant submitted at least 19 units to the Government for testing which were manufactured before the appellant could possibly have made any changes to its production line. These 19 units include the preproduction samples which the appellant's president had hand-carried to the University. The shipments to which we refer were made on 3 December 1953 * * * and on 7 December 1953 * * *. The preproduction units and all but one of the production lot samples passed the vibration tests. This one unit failed after it had been vibrated 7¾ hours (out of the 9 hours required). In spite of the failure, the Government determined that the unit was acceptable and authorized shipment of 100 per cent of the production lots represented by the production lot samples.[9]

It is significant that plaintiff does not controvert the fact that no materials were reworked involving the samples for lots 2, 3, 4, and 5 and, before the Board, by its attorney, admitted such fact. The conclusion is inescapable that the mere decision to utilize sway braces (which are used in actual flight) by the defendant in performing the destructive vibration test, did not compel a design change in the adapter.

██ Plaintiff argues that it was error to attach the adapter to a "combo" during the vibration test. Plaintiff's representatives also maintained that such a "hookup" was not contemplated in preparing its bid. Disregarding the conflicting positions taken by plaintiff during the ASBCA hearing, the following

9. While plaintiff correctly points out that two adapters representing lot 5 failed the vibration test, both had been vibrated for at least seven out of the required nine hours. It does not seem material, as plaintiff argues, that there were vibration test failures, for that fact alone would not be authorization to institute any changes in production processes. It should be remembered, that the changes so instituted were made approximately the same time the samples for lots 2–5 were shipped to Pittsburgh. Even if a report of failure was sufficient, plaintiff did not have that information since the report on production lot 5 was not issued until January 26, 1954.

language from specification MIL–A–6760A is pertinent:

### 1. SCOPE

1.1 * * * This adapter is suitable for carrying and launching 2″-.25 Sub-Caliber Aircraft Rockets (hereinafter abbreviated SCAR) *and is intended for use with the Combination Bomb Rack and Rocket Launcher Aero 14A.* [Emphasis supplied.]

Furthermore, the preamble of SR–142 provides:

* * * The Laboratory tests contained herein are intended for use in determining the suitability of rocket launchers *for service use* on Naval Aircraft. * * * [Emphasis supplied.]

It seems obvious that either one of the above provisions alone would have *at least* sparked an inquiry as to how the adapter operates in the field. But taken together, it seems clear that plaintiff should have anticipated the use of a "combo" in the performance of the destructive vibration test, since it was contemplated that the adapters would be tested under conditions simulating actual use conditions.

Another prong to the plaintiff's constructive change argument is that the conversation of December 3, set out in detail, supra, constituted the requisite notice to defendant of a conflict between the drawings and the tests, and that defendant breached its obligation to authorize the necessary changes in accordance with § 6.1 of MIL–A–6760A. More precisely, plaintiff argues strongly—on the basis of (a) Mr. Dittmore's discussion with Mr. Morgan, (b) certain correspondence between plaintiff and defendant, (c) the Firecraft letter, and (d) all of the circumstances surrounding the negotiations carried on by the parties—that it gave notice of a conflict and that it was either authorized, or in the alternative, compelled to tighten the tolerances of the adapter. This argument, however, is predicated primarily on Mr. Dittmore's

version of the December 3 telephone conversation.

Although adequacy of the notice is a question of law, Farnsworth & Chambers Co., Inc. v. United States, 346 F.2d 577, 581, n. 8, 171 Ct.Cl. 30, 36, n. 8 (1965), our inquiry, as was the Board's, is addressed to whether, in fact, any notice of a conflict was communicated to the defendant.

The Board's decision contained a detailed statement of the facts and circumstances attendant to the telephone conversation of December 3, 1953, and indicates a careful consideration of the meaning of such facts and circumstances as they pertain to the intention of the parties regarding the applicable tests of SR–142.

The specific details of the conversation between Mr. Dittmore and Mr. Morgan cannot be accurately reconstructed at this late date, because the present-day recollections of persons who participated in the conversation differ as to what was said. We are faced, therefore, with the inferential finding of the Board that the conversation of December 3, only involved a discussion of sway braces. It does not appear from the excerpt from the Board's opinion that it made this express finding, but it is more than evident that the Board accepted the testimony of Mr. Morgan.

Mr. Morgan testified that the only recollection he had of the telephone conversation was that it "dealt solely with the question of whether or not the sway braces should be used. * * *" Mr. Morgan testified further that he would not have agreed at that time, and does not now agree, that there was any need for a change in the design of the sway braces or to tighten up the tolerances of the adapter. As of 3 December 1953, the date of that conversation, Mr. Morgan was aware that the adapters had been successfully manufactured by another manufacturer using substantially the same plans and specifications and that these units passed the vibration tests and were

subsequently accepted by the Government.[10]

In reviewing an administrative decision, it has been noted that the administrative tribunal had the opportunity to observe the demeanor of the witnesses, while this court looks only at "cold records." NLRB v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). It follows that this court should accept the administrative evaluation of credibility, unless the testimony accepted is inherently improbable or discredited by undisputed evidence or physical fact. Where two versions of the facts are equally probable, this court would normally be constrained to favor the version accepted by the Board. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966).

Although presiding Board member Taylor passed away prior to rendering a decision, the ASBCA's version of the conversation cannot be discarded. Mr. Morgan's testimony was not improbable nor discredited. It should be recalled that plaintiff's visit to the test laboratory on December 3, 1953, was precipitated by previous test failures. Then, during the disputed telephone conversation, it was agreed that sway braces would be used. Certainly, common sense bears out the conclusion that the results of the tests with sway braces should have been awaited before defendant could be charged with knowledge of a conflict. But plaintiff seeks to charge defendant not only with notice of a conflict prior to receiving those results, but also with liability for the changes made by plaintiff in the drawings. Such a position cannot be accepted and it must be concluded that plaintiff voluntarily assumed this additional expense.

Plaintiff, however, asserts that the Firecraft letter (set out in footnote 5) was sufficient notice to defendant that a conflict existed between the drawings and test specifications. The crucial factor, however, is that that letter referred only to the 1949 drawings and this fact necessarily constitutes a fatal bar to plaintiff's contention. It is undisputed that there were omissions and discrepancies in the 1949 drawings, but all of the present issues have been concerned with the drawings officially approved in July of 1953. Plaintiff concludes with the argument that the correspondence advising it to comply with both the drawings and the specifications compelled it to rework materials. Inasmuch as plaintiff's argument assumed that defendant was in error in requiring compliance with both, its argument fails. It has already been determined that the contracts explicitly required compliance with both the drawings and the specifications, and such a direction is a far cry from insisting upon a change or authorizing or compelling a change in the product to be manufactured.

In conclusion, one observation should be noted. It is difficult to believe that the plaintiff would have failed to register a protest, or to insist upon a written change order if it had in fact believed that defendant was acting beyond the terms of the contract. See Merritt-Chapman & Scott Corp. v. United States, 178 Ct.Cl. 883, 905 (1967), cert. denied, 389 U.S. 851, 88 S.Ct. 48, 19 L.Ed.2d 120; J. A. Ross & Co. v. United States, 115 F.Supp. 187, 190–191, 126 Ct.Cl. 323, 329–330 (1953). In this regard, the only communication apprising defendant of a conflict, the effect of which is not controverted, was received by the defendant in October 1955, almost two years after the changes were made.

B. *Life Test and Latch Mechanism Release Test*

With respect to the life test, the plaintiff conceded it was not instructed to bring down the test readings and the item was not shown to have failed that test. Entitlement to a recovery based upon the

---

10. The facts attacked by plaintiff, as lacking substantial support in the record, for the most part were admitted by defendant to be erroneous. Yet, these errors were not prejudicial in the sense that the ASBCA decision must be reversed.

alleged erroneous performance of this test has not been demonstrated.

 So far as plaintiff's complaint is addressed to the conduct of the Latch Test, we accept the Board's finding that:

\* \* \* The preproduction units which were hand-carried by appellant's president to the University were approved by the Government, and the production lot samples which had been selected from lots manufactured before any changes could have been made by appellant were likewise approved and accepted. In fact, the record before us indicates that the Government's first rejection occurred on 30 April 1954, at which time 6 production lot samples failed to pass the test. In all, counting retests, 35 production lot samples were rejected for defects in the latch mechanism release. In 34 of the 35 rejections all three readings, as well as the average of the readings, were outside the 125- to 175-pound range. In the 35th instance, the rejection was due to a flaw in the mechanism. All 35 of these units would have failed under the appellant's interpretation of the contracts. We conclude that the difference between the appellant's interpretation and the Government's interpretation had no practical effect on any of the rejections.

Under these circumstances, plaintiff's claim must be denied.

 Delay damages must also be denied inasmuch as defendant was not unreasonable in insisting upon compliance with the terms of the contract.

### CLAIM 4

#### Legal Expenses

Expenses in attempting to obtain administrative relief, or in preparing for and conducting the present litigation are not recoverable. Rash v. United States, 360 F.2d 940, 947, 175 Ct.Cl. 797, 810–811 (1966).

### CONCLUSION OF LAW

Upon the foregoing opinion which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.