**TIBSHRAENY BROTHERS CONSTRUCTION, INC.,**
Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 610–81C.

United States Claims Court.

Oct. 12, 1984.

---

Jack Daniel Klausner, Phoenix, Ariz., for plaintiff.

Leodis C. Matthews, Washington, D.C., with whom as Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

## OPINION

TIDWELL, Judge:

This is a government contract case which comes before the court pursuant to the Tucker Act, 28 U.S.C. 1491, and the Contract Disputes Act of 1978, 41 U.S.C. 609(a)(1). Plaintiff appeals the contracting officer's decision which denied plaintiff's claims for damages in the amount of $127,-269 for breach of contract. In addition, plaintiff seeks the release of $20,000 retained by defendant under the contract. Plaintiff claims money damages for time delays and extra costs incurred because of defendant's alleged failure to provide a complete and accurate set of electrical control drawings. For want of a better name

this court will refer to the allegedly omitted drawing or drawings as the "control wiring diagram."[1] Defendant denies plaintiff's contentions and alleges that the drawings were complete and adequate and that the contract required plaintiff to provide the control wiring diagram. Trial was held in Phoenix, Arizona and after careful review of the evidence presented and the applicable law, the court holds for plaintiff on the issue of liability.

## FACTS

On July 8, 1977 the Department of the Air Force publicly advertised bids for the modification of existing fueling facilities and for the construction of a hydrant fueling system with POL (jet fuel) operation facility, blast deflector and taxiway at the Arizona Air National Guard facility located at Sky Harbor International Airport, Phoenix, Arizona. Plaintiff, Tibshraeny Brothers Construction Company, a general contractor with offices in Mesa, Arizona, was low bidder and on September 10, 1977 was awarded Contract No. DAHA02–77–C–0023 to construct the project.

In order to prepare the specifications and drawings for the construction of the hydrant fueling system, the Air Force within the same time period entered into a contract with Benham-Blair Ditzler & Elling (Benham-Blair) to provide architect-engineer services. Benham-Blair was required under its contract to design and prepare a completely operational hydrant fueling system based on definitive design drawings prepared by the Air Force.[2] Benham-Blair utilized the definitive design drawings to prepare the plans and drawings for the

hydrant fueling system which became part of the bid documents. In addition, Benham-Blair modified a set of standard government specifications which also became a part of the bid documents. Before issuing the plans and specifications, they were reviewed by the contracting officer, Harold P. Porter, and the legal and engineering staffs for the Air National Guard in Washington, D.C., and by the regional civil engineer, Department of the Air Force, Western Division, San Francisco, California, and were accepted for use on this project. These modified plans, drawings and bid specifications became part of the contract documents for the hydrant fueling system upon award of the contract to plaintiff.

Originally, the contract was to be completed within 240 days after acknowledgement of the notice to proceed which was issued on September 15, 1977. However, the project was not completed and approved until some 752 days beyond the scheduled completion date. A pre-construction conference was held on September 12, 1977 to discuss all aspects of the project including completion schedules. No questions were raised at that conference or at any time prior to the conference by either party about the electrical diagrams shown on pages E–7 and E–8 of the drawings and addressed in several places in the specifications.

Plaintiff began performance within ten days after acknowledging receipt of the notice to proceed and continued construction of the project until forced by weather conditions at the work site to halt construction. Consequently, the contracting officer issued a change order (contract modifica-

---

1. At trial considerable time was spent by expert and lay witnesses of both parties in attempting to define terms such as control wiring diagram, complete wiring diagrams, shop drawings, wiring diagrams, etc. In fact, the court learned from the witnesses that different experts may refer to exactly the same electrical diagram by different names. The court uses the term control wiring diagram only to designate the drawing showing the wiring system that controls the mechanical pumps, valves, etc. of the hydrant fueling system and makes no attempt to distinguish between other terms.

2. The court was informed that "definitive design drawings" were, in effect, "generic" plans prepared by the Air Force from which specific plans can be developed for specific sites, taking into consideration problems that may exist at those sites, yet still guaranteeing a high degree of uniformity. Since the definitive design drawings are not in litigation here, we need not address them further except as needed hereafter to help explain the issues in the case.

tion P–00010) extending the completion date of the contract 63 days or until July 15, 1978.[3]

During construction of the hydrant fueling system, a dispute arose regarding responsibility for preparation of the control wiring diagram which was necessary for completion of the project. In February of 1978 a meeting was held between defendant, plaintiff's electrical subcontractor, Paradise Valley Electric Company, and plaintiff's representative where the need for the control wiring diagram was discussed. At that meeting plaintiff's subcontractor provided a scheduled completion plan for installation of the control wiring system by July of 1978.[4] Plaintiff, however, testified that the issue of whether or not more definitive drawings were needed for the control wiring diagram was not raised at the meeting. Plaintiff also testified that it did not become aware that defendant expected plaintiff to provide the control wiring diagram until July of 1978, near the amended completion date of the contract, when the government notified plaintiff's project manager that plaintiff was to provide the control wiring diagram.

Regardless of when it was first brought to plaintiff's attention, it is clear that at some point the issue of responsibility for preparation of the control wiring diagram arose. It was plaintiff's contention that the control wiring diagram was a design function for which either the government or the government's architect-engineer, Benham-Blair, was responsible. Plaintiff also contended that nowhere in its contract with the government was it required to provide a control wiring diagram. Instead, plaintiff insisted that Benham-Blair was to perform all design work for the project and to provide complete construction plans and drawings for a fully operational hydrant refueling system including the control wiring diagram. Benham-Blair, however, re-

fused to provide the control wiring diagram contending, with the government's support, that it was plaintiff's obligation.

Plaintiff, under protest and in an effort to complete the job, asked the Paradise Valley Electrical Company, to prepare a control wiring diagram. Paradise Valley Electric Company obtained the services of Russell Scholtz, an experienced electrical engineer, and instructed him to "design an operable control diagram for the hydrant refueling system."

After several weeks of effort, Mr. Scholtz completed a control wiring diagram of his *own* design which corrected major defects in the original design concept. Plaintiff, on December 15, 1978, submitted the diagram to Benham-Blair through defendant for approval. Benham-Blair rejected the submittal almost immediately on the basis that "the basic design of the diagram was different from that set out in the plans and conceptual drawings E–7 and E–8." The Benham-Blair rejection also contained the statement "submit in accord with contract documents."

Plaintiff contends that Benham-Blair gave no indication that the design of the control wiring diagram as prepared by Mr. Scholtz would not work, but that the submittal was rejected because Mr. Scholtz did not use Benham-Blair's symbols or style of drawing. Plaintiff further contends that Mr. Scholtz was told by a representative of Benham-Blair that he was to use the symbols on the Benham-Blair drawings, make corrections as needed, and design a control wiring diagram within the parameters of the Benham-Blair design concept.

Thereafter, Mr. Scholtz prepared a second control wiring diagram which corrected numerous errors in the Benham-Blair design concept and which did use the Ben-

---

**3.** The 63-day extension was prompted by heavy rains and flooding which resulted in damage to certain pipe that was to be installed on the project. All claims stemming from that incident were resolved in an action brought before the ASBCA in *Appeal of Tibshraeny Brothers Con-*

*struction, Inc.,* ASBCA No. 23215 (May 25, 1979) and, thus, are not at issue here.

**4.** The court takes note of the fact that Paradise Valley Electric Company was instituting bankruptcy proceedings at this time.

ham-Blair symbols and style of drawing.[5] Plaintiff submitted Mr. Scholtz' second control wiring diagram on February 14, 1979. Plaintiff's second submittal was rejected by Benham-Blair on April 17, 1978. Paradise Valley Electric Company went into bankruptcy proceedings in early 1979 and, as a result, Mr. Scholtz was never paid for his previous drawings, and, quite naturally, refused to continue working to revise the rejected drawings.

Thereafter, Captain Sam Lundgren, who became base civil engineer in March of 1979, revised Mr. Scholtz' second control wiring diagram submittal and submitted, under plaintiff's signature, a third control wiring diagram dated May 1, 1979, which was also rejected. Captain Lundgren then made several slight modifications to the third submittal, and a fourth control wiring diagram submittal, under plaintiff's signature, was made on May 9, 1978. The fourth control wiring diagram submittal was also rejected. Finally, Captain Lundgren modified portions of the fourth submittal and resubmitted the control wiring diagram. Benham-Blair approved the modified control wiring diagram submittal dated July 2, 1978 and plaintiff used that control wiring diagram with its accompanying bill of materials to order necessary materials and to construct the control wiring portion of the hydrant fuel system.

The system was in place by late 1978, however, additional field testing and modifications were required to make the control system function as intended. The project was finally completed and approved on August 7, 1980. The government retained some funds under the contract to offset damages caused by the delayed performance by plaintiff. The retainage was reduced to $20,000 on January 12, 1980.

Prior to January 15, 1981, plaintiff filed a claim with the contracting officer for $127,-269 for costs incurred resulting from the problems and delays surrounding the dispute over the control wiring diagram. Plaintiff's claim for reimbursement of excess costs was denied by the contracting officer on June 8, 1981. In addition, the government continued to withhold the $20,-000 retention from plaintiff.

Thereafter, plaintiff elected to appeal under the Contract Disputes Act, 41 U.S.C. 609(a)(1), and filed suit in this court on October 15, 1981 seeking *de novo* judicial review of its claim. Jurisdiction is proper pursuant to 28 U.S.C. 1491 and 41 U.S.C. 609(a)(1).

### DISCUSSION

■ The two-pronged issue before the court is whether the solicitation required a more detailed and complete wiring diagram than the "ladder diagrams"[6] included in the solicitation, and, if so, was plaintiff to provide the control wiring diagram. The court finds the first question quite easy to answer: Yes, more detailed drawings were needed. The court listened to a litany of expert and lay witnesses for plaintiff pointing out, for different reasons, why more detail was needed. The contract was, of course, silent on this point; the witnesses were not. Defendant made an attempt to establish that the "ladder diagrams" on pages E–7 and E–8 of the drawings were all that a knowledgeable electrician would need to wire the system. The court disagrees. First, those drawings were defective in part as detailed by Mr. Scholtz and second, the court finds plaintiff's expert and lay witnesses more credible and persuasive than defendant's in explaining why

---

**5.** Mr. Scholtz described the errors as major design defects. Mr. Scholtz completed the design drawings to a point where plaintiff could begin to select component parts for the control system which it could not do under the original Benham-Blair drawings, plans and specifications.

**6.** The term "ladder diagram," like "control wiring diagram" was used by some of the expert and lay witnesses. There appeared, though, to

be no dispute about the meaning of the term ladder diagram. When shown drawings E–7 and E–8 the witnesses generally referred to them as "ladder diagrams" or "these drawings." Again, for the sole reason of distinguishing between the two, the court will refer to the original E–7 and E–8 drawings as ladder diagrams and to the drawing that was developed from the ladder diagrams as the control wiring diagram.

more detail was needed to bring the drawings to a point where they could be used by an experienced electrician to wire the electrical portion of the hydrant fueling system.

We turn now to the second prong of the issue; who was responsible for preparation of the control wiring diagram. This dispute arises out of the parties' interpretation of the contract specifications, drafted by Benham-Blair and provided to plaintiff by defendant. Defendant says that it intended to, and did in fact, provide in the contract that plaintiff was responsible for preparing the control wiring diagram. Plaintiff, on the other hand, contends that the specifications did not require it to prepare the control wiring diagram. Plaintiff further contends that, because the preparation of the control wiring diagram was a design function, it was to be performed by either the government or Benham-Blair. Plaintiff also contends that the specifications were at the least ambiguous in identifying which party had responsibility for preparation of the control wiring diagram and that, in the absence of a clear statement in the contract shifting responsibility for design of the control wiring system to plaintiff, the control wiring diagram remained a design function for which either the government or Benham-Blair was responsible.

█ The controversy thus centers on the construction or interpretation of the contract provisions. In general, it can be said that the provisions of a contract must be construed to effectuate the spirit and purpose of a contract. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). The agreement must be considered as a whole and interpreted so as to harmonize and give meaning to all its provisions. *Thanet Corp.*, 219 Ct.Cl. at 82, 591 F.2d at 633; *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975). When the meaning of a provision is ambiguous and reasonable men could interpret the provision in different ways, the interpretation will be given to the document which is more favorable to the party who did not draft the provision. *Thanet Corp.*, 219 Ct.Cl. at 82, 591 F.2d at 633; *Kenneth Reed Construction Corp. v. United States*, 201 Ct.Cl. 282, 289, 475 F.2d 583, 587 (1973); *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970).

█ After reviewing the extensive evidence presented at trial addressing the interpretation of the contractual provisions, the court is of the opinion that the contract is, at the very least, ambiguous on the issue of responsibility for preparing the control wiring diagram. Since the contract is reasonably susceptible to more than one interpretation and the court finds both parties' interpretations to be reasonable and even plausible, the interpretation favoring plaintiff, as the non-drafting party, prevails. *Kenneth Reed Construction Corp.*, 201 Ct.Cl. at 289, 475 F.2d at 587; *Sturm*, 190 Ct.Cl. at 697, 421 F.2d at 727.

The court finds no specific reference in the specifications to a control wiring diagram nor to which party had the responsibility to provide a control wiring diagram. Defendant points to sections 15B–04 paragraphs 7.5.1 through 7.5.4 read in conjunction with section 1A–05 paragraph 11.1 and section 15B–02 paragraph 6 of the contract as support for its position that the contractor had the responsibility to prepare and provide the control wiring diagram.[7] How-

---

7. Section 1A–05

11.1 *Contractor* shall provide as-built drawings which shall show all differences between the contract documents as drawn and installed for all work, as well as work added to the contract.
Section 15B–02
6. COMPATIBILITY OF EQUIPMENT: The contractor shall assume full responsibility for satisfactory operation of all component parts of the mechanical systems to assure compatibility of all equipment and performance of the integrated systems in accordance with requirements of the specifications, and without excessive or unusual operation, service and/or maintenance requirements. Should the contractor consider any part of the specifications or drawings as rendering his acceptance of such responsibility impossible, prohibitive, or restrictive, he shall so notify

ever, none of the cited sections read together or individually mention the term "control wiring diagram," nor is the concept of a control wiring diagram ever meaningfully developed in the provisions cited in footnote No. 8, or for that matter, anywhere else in the contract. In fact, defendant's witnesses, Jim Elling, Benham-Blair's project manager, and Jewell Wood, also of Benham-Blair, testified that the contractor's responsibility to prepare and provide a control wiring diagram was not explicit, but only implicit, in the contract documents. In the absence of clear language shifting the responsibility to prepare the control wiring diagram to plaintiff as general contractor, the court finds that the responsibility remained with defendant or perhaps its architect-engineer, Benham-Blair. *See Kenneth Reed Construction Corp.*, 201 Ct.Cl. at 291, 475 F.2d at 587.

■ While it is true that the intention of the parties to a contract gathered from the instrument as a whole controls its interpretation, ascribing to the contract language its ordinary and commonly accepted meaning, *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Kenneth Reed Construction Corp.*, 201 Ct.Cl. at 288, 475 F.2d at 586; *Hol-Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965), the court may not give preference to the subjective unexpressed intent of one of the parties. *ITT Arctic Services, Inc.*, 207 Ct.Cl. at 751, 524 F.2d at 684. Thus, defendant's unexpressed intention that plaintiff supply the control wiring diagram will not be given preference in this instance.

Defendant, in support of its position, stated that it was its intent, together with that of Benham-Blair, to require the contractor to prepare the control wiring diagram. While this may have been the case, this intention was not communicated effectively to plaintiff by the bid documents, the contract, or by other means until near the planned end of the contract.[8] Therefore, weight must be given to the interpretation of the contract as construed pursuant to the rules of contract construction previously cited and the reasonable interpretation favoring the non-drafting party.

Defendant offers, as applicable in this case, an exception to the rule that an unclear or ambiguous provision must be interpreted in favor of the non-drafting party. In *George E. Newsom v. United States*, 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982) the court said:

> The analytical framework for cases like the instant one was set out authoritatively in *Mountain Home Contractors v. United States* [192 Ct.Cl. 16, 425 F.2d 1260 (1970)] [citation omitted]. It mandated a two step analysis. First, the court must ask whether the ambiguity

the Contracting Officer before submitting his bid, and the bid shall be accompanied by a written statement of any objection or exception to the specifications and drawings.
Section 15B–04
"7.5 *Third stage submittal:* This shall be submitted within thirty (30) days after return of second stage submittal, and shall consist of contractor's shop drawings covering installation details. Drawings required shall include:
"7.5.1 Complete wiring diagrams for all equipment furnished under the mechanical contract, prepared by the furnishing contractor, for the use of electrical trades, showing all equipment and control device terminals and the relationship to the electrical service.
"7.5.4 Contractor's drawings shall be forwarded in single copy sepia or other equivalent transparency and one blue line print. Notations as to acceptance or correction will be noted on transparency. Upon return of

the transparency, the contractor shall correct the original tracing and submit a new transparency for approval. Upon final approval of the transparency, the contractor shall prepare prints for the use of the various trades as may be required."

8. The evidence shows that plaintiff was first informed by defendant that it was expected to prepare a control wiring diagram either on February 28 or in mid-July 1978. Defendant also suggests that plaintiff should have sought clarification on the issue at the Pre-Bid Conference, however, this argument is nullified by the flip side of the argument, to wit; that defendant perhaps should have notified plaintiff that a more detailed and complete control wiring diagram was needed and that plaintiff would be responsible for providing it, which defendant did not do.

was patent. This is not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum. Is it *so* glaring as to raise a duty to inquire? Only if the court decides that the ambiguity was not patent does it reach the question of whether or not plaintiff's interpretation was reasonable. (Emphasis in original)

*See also Highway Products, Inc. v. United States,* 208 Ct.Cl. 926, 942, 530 F.2d 911, 920 (1976); *Space Corp. v. United States,* 200 Ct.Cl. 1, 6, 470 F.2d 536, 539 (1972); *HRH Constr. Corp. v. United States,* 192 Ct.Cl. 912, 919, 428 F.2d 1267, 1271 (1970); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 6, 314 F.2d 501, 504 (1963).

In the present case, the court found the contract language to be at least ambiguous. It is also apparent that the ambiguity was not readily ascertainable. Based on the rule in *Newsom,* the court finds that the ambiguity was not patent and, therefore, that there was no duty on the part of plaintiff to question who would be responsible for providing the more detailed and complete control wiring diagram. The court also finds that plaintiff's interpretation was reasonable, which means that neither prong of the analysis urged by defendant will support an exception to the general rule.

The contractual interpretation favoring plaintiff is also supported by well-settled rules of contract interpretation such as the use of trade meaning usage and custom to explain or define contract language. In *W.G. Cornell Co. of Washington, D.C., Inc. v. United States,* 179 Ct.Cl. 651, 376 F.2d 299 (1967), the court was faced with a similar circumstance where the contract language was reasonably susceptible to a different interpretation than that adopted by the government, but had not reached the stage where the contract specifications disclosed an obvious omission or inconsistency. *See Beacon Construction Co.,* 161 Ct.Cl. at 7, 314 F.2d at 504. In dealing with the different interpretations, the court in *W.G. Cornell* allowed evidence of trade meaning usage and custom to explain or define contract language. The court cited precedent to the effect that:

The language of a contract is to be given effect according to its trade meaning notwithstanding that in its ordinary meaning it is unambiguous. That is to say that trade usage or custom may show that language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning. (Citation omitted.)

179 Ct.Cl. at 669, 376 F.2d at 311.

■ Accordingly, evidence of trade meaning, usage and custom may explain or define contract language, but will not be employed to vary or contradict the same. Thus, to give meaning to the intention of the parties, evidence of trade meaning, usage or custom is an acceptable aid in interpreting contract terms. *Gholson, Byars & Holmes Const. Co. v. United States,* 173 Ct.Cl. 374, 395, 351 F.2d 987, 999 (1965). In the instant case, evidence of trade meaning, usage or custom was introduced by both parties. The weight of the evidence showed that the trade usage and custom with which plaintiff was familiar supported its position that a contractor is not generally required, in the absence of a specific provision to the contrary, to design and prepare the control wiring diagram. *See Kenneth Reed Construction Corp.,* 201 Ct.Cl. at 288, 475 F.2d at 586.

■ Finally, prior course of dealing can furnish an interpretation of a term to a contract, provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions and reflective of their common understanding. RESTATEMENT (SECOND) OF CONTRACTS § 249 (Tent. Drafts Nos. 1–7 1973). In resolving ambiguity in a contract it is proper to look at the past conduct of the parties. *L.W. Foster Sportswear Company v. United States,* 186 Ct.Cl. 499, 509, 405 F.2d 1285, 1290 (1969). In this case plaintiff had prior dealings with defendant which support plaintiff's position. Plaintiff, in 1974, was the general contractor for the first stage of

the self-same fueling system at the Air National Guard facility at Sky Harbor International Airport that is at issue in this case. Plaintiff provided evidence not rebutted by defendant which showed that plaintiff was furnished the control wiring diagram by defendant after the construction began on the initial project. In the absence of a specific designation of responsibility to provide the control wiring diagram, it appears to the court that plaintiff may rely on its former course of dealing with defendant. Thus, the expectation that the control wiring diagram would be furnished by defendant for this contract at some point during construction was not unreasonable.

As further support for the court's holding, we need look only to the contract between defendant and its architect-engineer, Benham-Blair. Defendant contracted with Benham-Blair to design a fully operational hydrant fueling system. Benham-Blair was to provide, among other things, "final designs, detailed working drawings and specifications and design analysis with calculations in accordance with government standards necessary for the effective coordination and efficient execution of the construction work...." Benham-Blair was to provide the government with a "design of a complete hydrant fueling system with enough information in the plans and specifications from which a complete and operable system could be built." It is clear to this court that defendant intended that Benham-Blair do all *design* work for the hydrant fueling system. Where plans and specifications were not complete or required revision Benham-Blair was to revise them as necessary.

Testimony presented at trial has convinced the court that the drawings and specifications for the electrical control system provided by plaintiff were *not* complete. Rather, further design work was required to correct basic errors, enable plaintiff to choose the component parts and to coordinate the physical layout of the wiring system with all of its component parts, prior to approval by the architect-engineer. Since design work is specifically

within the realm of the architect-engineer's responsibility, and properly so, the court finds that plaintiff's interpretation is reasonable and plaintiff was not responsible to design or provide the control wiring diagram. The court finds that plaintiff, under protest, designed and provided the control wiring diagram and is, therefore, entitled to recover for any excess costs and time delays occasioned thereby.

Plaintiff's final argument, that defendant breached its implied warranty to provide proper plans and specifications by providing defective specifications, need not be considered in light of our holding.

## CONCLUSION

The court finds for plaintiff on the issue of liability and holds that plaintiff is entitled to recover all costs incurred as a result of preparing the control wiring diagram and costs of this litigation. The parties are directed to file a stipulation as to the amount of plaintiff's recovery by November 13, 1984.

IT IS SO ORDERED.