**UNITED STATES, Appellant,**

v.

**TURNER CONSTRUCTION
CO., Appellee.**

**Appeal No. 87–1049.**

United States Court of Appeals,
Federal Circuit.

May 22, 1987.

---

**284**

Helene M. Goldberg, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellant. With her on brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

Charles C. Meeker, Adams, McCullough & Beard, Raleigh, N.C., argued for appellee. With him on brief was E.D. Gaskins, Jr.

Before RICH, Circuit Judge,
NICHOLS, Senior Circuit Judge, and
SMITH, Circuit Judge.

NICHOLS, Senior Circuit Judge.

The United States appeals the final decision of the Armed Services Board of Contract Appeals (ASBCA), ASBCA No. 29176, 86–1 BCA (CCH) ¶ 18,691, concluding that the government's insistence on its view of the contract, Nos. 3301–50 and 141–77– 0006, was effectively a change in the contract specifications, and remanding for an award of an appropriate equitable adjustment. We affirm.

### Background

This case involves a contract between the Turner Construction Company (Turner) and the former Department of Health, Education, and Welfare for work in connection with construction of the National Institute of Environmental Health Services laboratory facility in Research Triangle Park, North Carolina. The work related to this dispute was performed by Johnson Controls, Inc. (Johnson), a Turner subcontractor. Turner has certified the claim following the decision of this court in *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983) rejecting a direct appeal by Johnson.

A portion of Johnson's contract with the government required the installation of air volume control systems, known as quantitative air control systems (QAC), in the laboratories. The QAC is directed by a velocity pressure transmitter, which is a device that transmits air volume information to the control center. The dispute in this case is whether the contract specifications for the QAC require location of the transmitters within central metal cabinets. Turner, on behalf of Johnson, says that the contract does not specify the location of the transmitters and they were therefore at liberty to place the transmitters near the source of the air, as they did. The government disagreed during performance and insisted that the transmitters be relocated from the "field" to the metal cabinets containing the QAC, resulting in additional costs to Johnson.

### Discussion

Knowledge of the board decision is assumed and reference is made thereto for all possibly relevant contract clauses. The provision of the contract most relevant to this discussion, specification § 17010, is as follows:

6. AIR VOLUME CONTROL CENTERS (QAC)

A. Air Volume Control Centers (QAC) shall be factory assembled and calibrated. It shall consist of metal cabinet constructed of 14 gage [sic] steel with hinged front, key locked doors, necessary guages, [sic] meters, controllers, etc., as specified herein and as shown on drawings, to achieve the function intended.

The question really is whether or not an "air volume control center" must include the transmitter. The description of the contents of the metal cabinet does not mention the transmitter. The board rejected the government's word-by-word analysis of the contract, repeated in part on appeal, intended to persuade the board and this court that the transmitters were intended for the metal cabinets. The government, for example, argued that the word "etc." in paragraph 6A was intended to include the transmitter in the contents list. The board rejected this argument, concluding that it is unlikely that the transmitter, the most expensive component of the QAC, would be referred to in such a minor and secondary fashion.

The contract was interpreted by letter after the first invitation for bids (IFB) to make it more clear a certain proprietary transmitter was not required. Some transmitters are normally installed in the "control centers," others are not. Bidders had construed the original IFB as requiring a proprietary transmitter of one type, that would have been in the "control center." On learning that this proprietary item would not be required, Johnson reduced its bid.

After considering the various clarifying correspondence and the events that transpired, the board concluded that the location of the transmitters was, in the final contract, discretionary and not a proprietary feature of the contract. The board then noted the government designer's concession that the transmitters function as effectively in the field as they would in metal cabinets and concluded that the forced relocation of the transmitters to the cabinets was a change in contract specifications for which equitable adjustment is due.

On appeal, the government focuses on paragraph 6A and argues that the contract is unambiguous, citing the word "etc." and "as specified herein" as indications that the metal cabinet clearly included the transmitter. Its secondary argument is that the question of functional equivalence is irrelevant. We disagree, although we view the functional equivalence analysis as only one component of the appropriate analysis of this case.

The suggestion that "as specified herein" was intended to include the transmitter is unacceptable for the same reasons the board stated regarding "etc." It is improbable that the most expensive, and by implication the most prominent, component of the QAC would be designated by indirect and secondary means. In reaching this conclusion, we note that "legal interpretations by tribunals having expertise are helpful to us, even if not compelling." *Erickson Air Crane Company of Washington, Inc. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984). In view of the great experience of the board in contract interpretation, "a Board's interpretation of a contract will be given careful consideration and great respect." *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir.1985) (citing *George Hyman Construction Co. v. United States*, 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977)).

We note at this point that neither the board nor the parties suggest that there was an ambiguity in this contract. The government insists that the contract clearly requires location of the transmitters in the cabinets and Turner that the contract clearly leaves the decision on where to place the transmitters entirely to the contractor.

It is unlikely that this dispute would be before this court if the contract were truly clear. The more appropriate analysis, therefore, is whether the ambiguity in the contract was patent, raising the duty to inquire and, if not, whether the interpretation of the contract by the party that did not write it was reasonable. *Newsom v. United States*, 676 F.2d 647, 650, 230 Ct.Cl.

301 (1982). After reviewing the relevant portions of the contract, we find no provisions "so glaring as to raise a duty to inquire," *Newsom, id.* at 650, and therefore no patent ambiguity. Essentially, the location of the transmitters appears to be a nonissue in the specifications. The only real suggestion of where the transmitters might go is by implication from the placement of the transmitter description in the QAC section. The absence of the transmitter in the crucial paragraph, 6A, however, is just as strong a suggestion that the location of the transmitters was, at the very least, a discretionary decision. In *Newsom,* unlike here, two provisions, each unequivocal by itself, pointed different ways.

We conclude that there was no patent ambiguity and that the contractor's interpretation of the specifications was reasonable, given the absence of mention of the transmitter in 6A (or anywhere), the performance nature of the contract, and the agency's purpose to avoid specifying a proprietary item. This conclusion is not made using a single general rule and is typically made on a case-by-case basis. *Newsom,* 676 F.2d at 649–50. Our recent case of *Edward R. Marden Corp. v. United States,* 803 F.2d 701 (Fed.Cir.1986), is a precedent that would require appellant here to have relied on his interpretation of the ambiguity when preparing his bid. There can be no doubt about that here, as the right to locate the transmitter outside the metal cabinet controlled the choice of a transmitter type.

Having concluded that Turner's interpretation of the contract was reasonable, we apply the rule of *contra proferentem,* which requires that a contract be construed against the party who drafted the document. *Id.* at 649. *Contra proferentem* applies when a contractor's reading of an ambiguous contract provision is reasonable in itself. *Santa Fe Engineers, Inc. v. United States,* 801 F.2d 379, 381 (Fed.Cir. 1986). This rule correctly requires the drafter to use care and completeness in creation of a contract.

In the instant case, the government's agent apparently failed to recognize that in revising the contract to avoid sole source or proprietary procurement of the transmitters, it produced an ambiguity as to where the transmitters might be placed, an ambiguity a bidder might reasonably interpret as this bidder did. Therefore, we affirm the board's decision recognizing the need for an equitable adjustment of the contract.

AFFIRMED.