UNDERGROUND CONSTRUCTION COMPANY, INC. and Continental Heller Corporation, A · Joint Venture, Plaintiff,

v.

The **UNITED STATES, Defendant.**

No. 683–85C.

United States Claims Court.

Dec. 9, 1988.

John R. Little, Jr., Denver, Colo., for plaintiff.

Carol N. Park–Conroy, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

### FACTUAL BACKGROUND

Plaintiff, Underground Construction Company, Inc. and Continental Heller Corporation, A Joint Venture ("Underground"), was awarded contract No. 3–CC–20–00520 in the amount of $14,456,000.20 by the Department of the Interior, Bureau of Reclamation ("Bureau"). The contract called for construction of the Pacheco Pumping Plant and Substation near Gilroy California. The pump station is part of a system transporting water from the Bureau's previously existing San Luis Reservoir to users in the Santa Clara Valley.

The purpose of the plant is to take water from Reach 1 of the Pacheco Tunnel, which delivers water to the pump plant from the reservoir, and lift it approximately 325 feet. The pump plant then delivers the water to Reach 2 of the Pacheco Tunnel which in turn is connected to a distribution network. The principal features required by the Pacheco Pumping Plant contract were a fifteen foot diameter surge shaft approximately 285 feet deep, an inclined transition tunnel, a twenty foot diameter pump chamber, twelve pump intake shafts with five-foot diameters, a pumping plant, and installation of Government furnished equipment.

The complaint contains, as amended, seventeen counts. Counts II, IX, X, XI, and XII of the complaint were dismissed with prejudice by joint stipulation of the parties on November 28, 1987. Counts III, XIII, and XIV are currently before this court on cross motions for partial summary judgment.

### DISCUSSION

RUSCC 56 generally requires that the moving party show that there is no genuine issue as to any material fact and that it is therefore entitled to judgment as a matter of law. In this connection, the court must

resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *Avia Group International, Inc. v. L.A. Gear California*, 853 F.2d 1557, 1560 (Fed. Cir.1988) (citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Interpart Corp. v. Italia*, 777 F.2d 678, 681 (Fed.Cir.1985); *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1546 (Fed.Cir.1984)). Here each party asserts that there are no material facts in dispute as to these claims and that it is entitled to judgment as a matter of law. However, the fact that both parties are movants does not release either from its burden of "demonstrating the absence of all genuine issues of material fact." *Id.* at 1560 (citing *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir. 1984)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). Only upon determination by the court that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" show no material fact is in dispute will summary judgment on the counts in question be appropriate. RUSCC 56(c).

### 1. Count III—Ladder and Hoist

■ In order to move water from the San Luis Reservoir to the Pacheco pumping plant, the pumping chamber had to be connected to the existing Reach 1 tunnel. This required dewatering of the Reach 1 tunnel and removal of the bulkhead (a steel plug). This was performed at the gate shaft located on an island in the Reservoir.

At issue in Count III is drawing No. 805–D–3382, entitled "Pacheco Inlet Channel and Tunnel to Sta. 199 + 17.00, Gate Shaft Plan and Sections." Above this title, the drawing is labeled "FOR INFORMATION ONLY." The drawing shows various sections of the gate shaft. In addition to giving dimensions, the drawing illustrates various details regarding construction and notes the location within the gate shaft of related items, such as a vent pipe. Three such notations concern a hoist and ladder. Section A–A of the drawing contains the notations "[h]oist not shown" and "[l]adder not shown." Each notation is followed by a dashed line and an arrow pointing to a specific location on the interior of the gate shaft. Section B–B contains the notation "[l]adder" and is similarly followed by a dashed line and an arrow that points to a dimension line designating a location on the interior wall of the gate shaft. Plaintiff's affidavits show that it relied on the drawing and notations exclusively in making its estimate on this portion of the contract.[1]

Plaintiff assumed that the ladder noted as "not shown" would be available for access to the interior of the gate shaft and that the hoist "not shown" would be available to lift a section of grating and assist in the installation of dewatering equipment required for the job. Upon commencing the work in November 1984, however, Underground discovered that neither the ladder nor the hoist was mounted in the gate shaft.

Plaintiff requested, by letter dated November 7, 1984, that defendant install the hoist and ladder. This request was denied, as was a subsequent request for reimbursement for the costs of installation of a ladder and the rental of a crane to replace the hoist. Plaintiff subsequently requested a final decision of the Contracting Officer ("CO") by letter of August 1, 1985. The CO denied Underground's request on October 7, 1985.

Plaintiff contends that it reasonably interpreted the contract drawings to indicate the hoist and ladder would be available for use in performing the contract. The Government contends that the correct interpretation of the contract drawing is that

---

1. According to Harry Robinson, Project Manager for Underground, and James Siler, Jr., President and Chief Executive Officer, no pre-bid inspection was made because it was impractical to access the island and the gate shaft considering the total amount bid for this portion of the contract. Defendant challenges Plaintiff's characterization of a pre-bid inspection of the gate shaft as impractical or impossible. Defendant contends this is not a statement of fact material to the legal issues raised, namely issues of contract interpretation. The court agrees.

neither of the items would be found in the gate shaft.

Contract interpretation is a matter of law. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 389 F.2d 424 (1968); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972 (1965); *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233 (1970). The court's fundamental task is to ascertain the intention of the parties, *Dynamics Corp. of America*, 182 Ct.Cl. at 72, 389 F.2d at 429, considering the instrument as a whole. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d 680, 684 (1975) (citing *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973)). In doing so, the court must give a reasonable meaning to all parts of the instrument rather than leaving a portion of it useless. *Martin Lane Co., Inc. v. United States*, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970); *see also Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971) (meaning determined from the perspective of "a reasonably intelligent person acquainted with the contemporary circumstances").

Defendant argues that Underground ignored the plain and ordinary meaning of the words on the drawing. Specifically defendant contends that the words "hoist not shown," "ladder not shown," and the notation "ladder," which indicates a location in the gate shaft where no ladder is depicted, clearly state that neither item existed in the gate shaft. This interpretation is unreasonable. The drawing denotes a number of items as not shown, such as the "mobile stem storage rack," the "grating," and the "cover" of the gate shaft. The clear impression left by these notations is that these items did, in fact, exist in the gate shaft but were not shown because their details were either unnecessary or their depiction would have unduly crowded the drawing. This interpretation is further supported by the fact that, as plaintiff notes, certain of the items designated as "not shown" in the drawing were present in the gate shaft; for example, the cover and the grating. Giving this language in the drawing its ordinary and commonly accepted meaning, *see Hol–Gar Manufacturing Corp.*, 169 Ct.Cl. at 390, 351 F.2d at 976, without twisted or strained analysis, *Aero Mayflower Transit Co. v. United States*, 162 Ct.Cl. 233, 237–39 (1963), it reflects the presence of a ladder and hoist in the gate shaft.

■ Defendant also argues that, reading the contract as a whole, Underground could not rely on the drawing in making its bid estimate since it was marked "for information only." Specification provision 17.1.1.e of the contract notes that drawings so marked are "intended to show some feature about which additional knowledge is required for bidding or for modification work." The provision states further that "[i]n the event there are differences as determined by the Contracting Officer between details and dimensions shown in these drawings and those of existing features at the site, the details and dimensions of existing features at the site will govern." Defendant argues that considering all of the above Underground had no right to rely on the drawing for the purpose of determining whether a ladder and hoist were present. The court is unpersuaded. To accept defendant's assertion implies the plaintiff had no right to rely on the drawing at all. The provision cited by defendant simply does not support its conclusion. The provision's scope, as reasonably inferred from its plain language, is limited to "details and dimensions" of existing features. The provision cannot reasonably be extended to accommodate so great a deviation as the absence of an article the presence of which is clearly suggested.

Defendant's motion does not challenge Underground's claim for damages, which is supported by its December 7, 1984 claim to the contracting officer. The court thus finds that Underground is entitled to judgment as a matter of law for $4775.44 on Count III.

2. Count XIII, Storage Shed Power

■ Plaintiff claims it is properly entitled to $15,053.25 which the Government has withheld as payment for electricity sup-

plied to defendant's temporary storage building ("TSB"). The building had been installed on the site prior to plaintiff's arrival. It was used by Underground, pursuant to the contract, to store government-supplied equipment. The Government obtained and paid for electrical power in the building during the period of the contract. However, defendant subsequently charged Underground for the power provided. Plaintiff claims that the contract language is unambiguous in requiring that the defendant supply and pay for power to the building. In the alternative, Underground argues that the contract is ambiguous, and the ambiguity should be resolved against the Government where Underground's interpretation of the contract terms is reasonable based on the language and the "prior course of dealings" between the parties. The court disagrees with both of these arguments.

The relevant provisions are as follows:

1.2.1 Materials Furnished by the Government

. . . .

The existing temporary storage building at the worksite will be available for use after January 1983 and shall be used for indoor storage of items (2) and (5). . . . The Contractor shall provide suitable indoor storage for items (4), (16), (17), and (18); and shall provide suitable means of protection for materials that require indoor storage. . . .

. . . .

The Contractor shall store and care for the materials in the most suitable manner to protect them from distortion, dust, water, or other damage. . . . The Government reserves the right to direct the Contractor to provide means of protection for Government furnished material which reasonably might be required for their storage and care; however, the exercise of or failure to exercise this right shall not be deemed to relieve the Contractor of his primary responsibility for protecting Government furnished materials.

. . . .

The cost of unloading, hauling, storing, handling, and caring for all materials furnished by the Government shall be included in the price bid for the work in which the materials are to be used.

1.3.11 Electric Power for Construction Purposes

Pacific Gas and Electric Co. has erected a temporary construction switchyard in the immediate vicinity of the worksite. The Contractor shall make all necessary arrangements with Pacific Gas and Electric Co. and shall provide all electric power required for his construction purposes. During the period of time covered by this contract, the Government will require power from the Contractor's power system for an office trailer. The Contractor shall make available such additional power in excess of his needs.

The Contractor shall provide all necessary transmission lines, distribution circuits, transformers, and other electrical equipment required for distributing the power to the place or places of use by the Contractor and the Government.

At the termination of the contract under these specifications, the Contractor shall dismantle and remove all distribution lines serving his installations, or those of his subContractors, that are not part of the permanent power installation.

No direct payment will be made to the Contractor for providing electric power for construction purposes and the cost thereof shall be included in the prices bid in the schedule for other items of work.

The court interprets the above provisions to require the contractor to pay the cost of electricity used as part of its obligation of caring for the government furnished equipment stored in the storage building. Paragraph 1.2.1 merely makes the TSB available for use. It goes on, however, to place on the contractor the burden of providing all means necessary for protecting government-furnished equipment. Moreover, paragraph 1.3.11 places responsibility on Underground for providing and distributing electric power. The fact that the Government offers use of a building and requires storage of certain items there is

not inconsistent with plaintiff's obligation to provide electricity and to assure proper storage of the equipment. Offering use of the building did not impose on defendant any additional obligation to supply electricity.

With respect to Underground's responsibility for "unloading, hauling, storing, handling, and caring for the equipment," it is undisputed that the electricity used in the storage building powered space heaters used to prevent corrosion in "large pump motors" stored there.[2] Plaintiff chose to use the on-site electricity to power the space heaters, thus fulfilling its obligation to protect the equipment.

Plaintiff argues that pursuant to section 1.3.11 it was only obligated to provide electricity "required for his *construction* purposes" (emphasis added), and since Underground did not do any "construction in the storage building ... but, rather stored government-furnished equipment there, as required by the specifications," it was not responsible for the cost of the electricity used. A single phrase cannot be read to the exclusion of others. The elements of an agreement have to be read in context. *Hol–Gar,* 169 Ct.Cl. at 395, 351 F.2d at 979; *Cedar Lumber, Inc. v. United States,* 13 Cl.Ct. 547, 551 (1987), *aff'd,* 857 F.2d 765 (Fed.Cir.1988). Section 1.3.11 considered in context indicates that electricity "for construction purposes" is all that electricity required by the contractor to perform the "construction contract" it was awarded for the Pacheco Pumping Plant and Substation.

The primary distinction to be drawn is between power used to perform the contract and power used by the Government for operation of the facility itself or for other purposes. This interpretation is consistent with all of the language of section 1.3.11. The provision notes that much of the contractor provided distribution network will become part of the permanent distribution network, suggesting a distinction between power required by the contractor for performance and that used by the Government for operation of the plant subsequent to completion. This interpretation is also consistent with the clause requiring that the cost of electric power be included in each bid item where the bid items collectively comprise the contract. The provision regarding the Government's on-site trailer is necessary under this interpretation where, unlike the TSB, the electric power used for the government trailer might not be considered by a prospective bidder to be part of its power need to perform the contract. Further the statement that the contractor shall make the power for the government trailer available "in excess of his needs," confirms the interpretation that power for construction purposes consists of all the contractor's power needs to perform the contract. Finally, this interpretation provides a rational standard for determining the contractor's obligation—if the power was used to perform the contract then it was plaintiff's obligation to provide it.

Underground's suggested interpretation, in contrast, would create a glaring ambi-

2. On October 3, 1988 Underground moved to file additional evidence in support of its cross-motion for summary judgment on Count XIII, the storage power claim. It sought to submit a portion of the telephone diary of Mr. William C. Hart, defendant's Project Construction Engineer, as well as a "faxogram" sent by Mr. Hart to the Sacramento and Denver offices of the Bureau of Reclamation. Both documents tend to show that proper care of the large motors stored in the TSB required energizing internal heaters to prevent corrosive condensation. They further reflect that this fact was known by the Government prior to bidding. Defendant opposes this motion, contending that the information in the faxogram was untimely submitted since the faxogram was in Underground's possession before filing of its motion, and that in any case, both the faxogram and the diary pages are irrelevant to interpretation of the contract. Defendant does not contend the materials create any genuine issue of material fact precluding summary judgment. The court finds no prejudice to defendant results from allowing the motion. The court thus allows plaintiff's motion and has considered the additional materials pursuant to RUSCC 56. However, the materials provide no new support for plaintiff's argument. Defendant does not dispute that the electricity at issue was used to energize space heaters in the pump motors, or that defendant required Underground to keep the heaters energized, or that it knew of this requirement prior to bidding. It is not clear to the court how these facts assist Underground. If anything, they show that keeping the heaters supplied with electricity was part of Underground's storage responsibilities.

guity in the provision, namely, the scope of the term "construction purposes." Underground contends power to store equipment to be installed in the facility cannot be considered power for construction purposes under section 1.3.11 while it concedes power used for power tools would be included in that description. However, plaintiff offers the court no criteria on which to base this distinction. Nor does it point to any language in the contract or extrinsic evidence which would support such a distinction.[3]

■ If the question now posed by the parties had been raised before performance commenced, it would seem very clear defendant should prevail. Nothing obligates it to provide electricity and Underground obligated itself to pay for construction electricity and to take care of materials stored in the TSB. Plaintiff finally argues, however, citing *Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl.Ct. 463 (1984), that the Government's failure to seek payment for the power at an earlier date constitutes a "course of dealings" between the parties and keeps defendant from denying now that it accepted the obligation to furnish electricity for the TSB.[4] The court finds no merit in this assertion. A course of dealing is defined as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Restatement (Second) of Contracts § 223 (1981). The primary problem with plaintiff's argument is that it attempts to qualify defendant's inaction, rather than affirmative acts, as prior conduct. Plaintiff cites no case law which would support such an analysis. *Tibshraeny* considered the prior affirmative act of one party that supplied certain drawings as some evidence that the same party should supply those drawings in a subsequent similar contract. *Tibshraeny Bros.*, 6 Cl.Ct. at 470–71. No such prior conduct "indicative of the parties' intentions," *id.* at 470, has been shown here. While a failure to act when obligated could conceivably constitute "conduct" creating a course of dealing, no such obligation or expectation has been shown here. Underground offers no rationale as to why defendant would or should have billed plaintiff before it did. As a result, there is nothing in the Government's failure to act prior to the time of its initial claim that could clearly be regarded as establishing a "common basis of understanding" regarding interpretation of the contract.[5]

The fact that plaintiff offers omission instead of action causes additional difficul-

---

3. The court notes a further inconsistency in plaintiff's position. Underground seeks only the cost of power in the TSB, yet if it truly contends that storage power is distinct from that used for power tools for the purposes of section 1.3.11, then presumably a myriad of similar disputes should have arisen on the contract. For example, power for the contractor-supplied storage building, power for Underground's construction trailers, lighting, and other items might arguably be more like storage power than power for tools. Yet no such arguments have been made.

4. Modification No. 097 was issued with an effective date of February 5, 1986. It reduced the contract price by $15,053.25 representing the cost of electrical power in the TLF from January 1984 through September 1985 plus overhead and interest from August 20, 1985 to March 23, 1986. The modification further recites that the Government's claim was first made by letter of August 19, 1985 to cover the cost of electricity used at the TLF through June of 1985. The claim notes also that the first delivery of the motors requiring the power was on January 9, 1984 and that the contract was awarded on March 7, 1983.

5. *See* Restatement (Second) of Contracts § 223; *see also Tibshraeny Bros.*, 6 Cl.Ct. at 470. Plaintiff couches its argument in terms of the Uniform Commercial Code concept of course of dealing. *See* Restatement (Second) of Contracts § 223 reporter's note. It might be considered more appropriately under decisions of our predecessor court which state that "the practical interpretation of a contract, as shown by the conduct of the parties, is of great weight in interpreting the contract." *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 73, 389 F.2d 424, 430 (1968) (citing *General Warehouse Two, Inc. v. United States*, 181 Ct.Cl. 180, 389 F.2d 1016 (1967)); *see also Sperry Corporation v. United States*, 845 F.2d 965, 970 (Fed.Cir.1988). Unfortunately for plaintiff, the analysis would be the same in either case where the inaction of both parties in this case has not been shown to constitute conduct relevant to a particular interpretation of the contract.

ty where the court attempts to identify the discrete events which would constitute a course of dealing. "The emphasis [in a course of dealing] is on a sequence of events; a single transaction cannot constitute a course of dealing." *International Therapeutics, Inc. v. McGraw–Edison Co.,* 721 F.2d 488, 491 (5th Cir.1983); *Compton v. Nationwide Mutual Ins. Co.,* 480 F.Supp. 1254, 1257 (W.D.Va.1979). Here, no sequence of events has been established since no events can be fairly discerned.

In sum, the plaintiff was obligated to properly store and care for government-furnished equipment and was obligated to provide and distribute electricity that it used to perform the contract. The court holds that these obligations independently and collectively mandate plaintiff's responsibility for the cost of powering the TSB. The Government's offer to provide a storage building to house certain items did not alter Underground's obligation to provide electrical power. Nothing in the contract supports the suggestion that the cost of utilities associated with the building were also to be provided by the Government. Consequently, plaintiff's claim on this issue fails.

3. Count XIV, the Crane Test Weights

█ Underground claims the contracting officer improperly denied its claim of $16,-393.85 for the construction cost of concrete weights to be used in testing the sixty-ton overhead crane required by the contract. The defendant claims these costs were to be included in Bid Item 75, a lump sum bid for furnishing and installing the crane. Plaintiff argues the costs should be charged under Bid Item 50, Concrete in Structures, Bid Item 55, Furnishing and Placing Reinforcing Bars and Fabric for Structures, and Bid Item 67, Furnishing and Installing Miscellaneous Metalwork. These items were bid on a unit cost basis.

The specification sections relevant to provision of the crane are, in pertinent part, the following.

14.3.1 OVERHEAD TRAVELING CRANE

a. General—*The Contractor shall furnish and install a 60–ton–capacity overhead traveling crane in accordance with these specifications....*

... The contractor shall assume full responsibility for a coordinated and adequate design conforming to current engineering practice....

....

b. Materials—

....

c. Storage—

....

d. Installation—Installation shall be in accordance with these specifications, the drawings and the manufacturers instructions, and shall include erecting the crane on the runway rails, completing all electrical wiring and making the crane ready for operation in all respects.

....

e. Acceptance tests—

(1) General—The Contractor shall test the crane when directed to do so by the Contracting Officer.... *The Contractor shall provide test weights and slings in accordance with drawing 113 (921–D–481), which shall become the property of the Government* and shall provide a crane operator, a safety man to keep the test area clear, and personnel and equipment to rig and haul the test weights....

(2) Tests—

....

f. Contractor's use of crane—

....

g. Payment—*Payment for furnishing and installing one 60–ton overhead traveling crane will be made at the lump-sum price bid therefor in part B of the schedule.*

(Emphasis added.)

The drawing noted in paragraph 14.3.1(e) above, 113 (921–D–481), is entitled "CRANE TEST WEIGHTS." Paragraph (e), Acceptance Tests, requires the contractor to provide the Government with test weights in accordance with the drawing. Paragraph (e) is one of the specifications in accordance with which the crane is to be furnished and installed per paragraph (a). Since 14.3.1(g) indicates that furnishing

and installing the crane will be paid for at the "lump-sum price bid therefor," defendant argues that the cost of the test weights should have been included in the price bid for furnishing and installing the crane.

Plaintiff contends that since section 14.3.1(g) does not expressly itemize the test weights as part of the cost, the "only obvious way of paying for them" is under the unit price concrete bid items. The court disagrees with plaintiff. There are many items in sections 14.3.1(a)-(g) which the contractor is required to provide as part of furnishing and installing the crane that do not appear expressly in the payment provision, for example, lubricant for the crane, temporary wiring required for testing, personnel for operation and safety during testing, storage for the crane prior to installation, and transportation of the test weights. Furthermore, Underground's interpretation ignores the language in 14.3.1(a) which requires the contractor to furnish and install the crane "in accordance with these specifications." Plaintiff's construction would ignore this clear demarkation of the scope of the term "furnish and install" and replace it with an ad hoc analysis of each item in paragraphs 14.3.1(a)-(g). The court thus finds Underground's argument in this regard to be without merit. The language of paragraph 14.3.1 clearly supports the Government's construction.

Underground also contends, however, that other contract provisions create an ambiguity in meaning. Plaintiff offers the affidavit of James G. Siler, Jr., President and Chief Executive Officer of Underground. Mr. Siler states: "Based upon our interpretation of paragraphs 14.3.1 and 6.1.1, we expected to be paid for the test weights under the bid items for concrete work, reinforcing and miscellaneous metal, at their respective unit prices." The contract provisions plaintiff relies on to reach this conclusion are, in pertinent part, the following:

SECTION 6.1—CONCRETE, GENERAL

6.1.1 Concrete Construction, General

All concrete construction shall conform to section 6.3 and to the detail requirements of the following paragraphs....

. . . . .

SECTION 6.3—GENERAL CONCRETE REQUIREMENTS

. . . . .

6.3.22 Payment for Concrete

a. Payment.—Payment for cast-in-place concrete in pump chamber and surgeshaft lining is provided for in paragraph 5.4.2.

Payment for *concrete in structures* will be made at the unit price per cubic yard bid therefor in part B of the schedule.

(Emphasis added.)

Underground's rationale is that since all "concrete construction" must conform to section 6.3, then payment for the concrete test weights should be governed by section 6.3.22, Payment, dealing with concrete used in structures. Underground suggests that further support for this interpretation comes from the Government's direction during the project that the contractor follow general specifications for structural concrete in building the test weights or that the government indicated it wanted "high-quality" test weights. This rationale is strained at best.

Section 6.2 of the specifications is entitled "Concrete in Structures" and clearly defines the scope of that term as utilized in subsection 6.3.22:

SECTION 6.2—CONCRETE IN STRUCTURES

6.2.1 Concrete in Structures

a. General.—The item of part B of the schedule for concrete in structures includes all concrete required for the following:

(1) The pumping plant structure, except backfill concrete.

(2) Surge tank.

(3) Inlet portal structure including retaining walls.

(4) Baffled outlet structure.

Plaintiff argues that "all concrete required for" the "pumping plant structure" includes the test weights. In its complaint, Underground cites paragraph 14.3.1(a) of the specifications: "The crane will be used

in the Pacheco Pumping Plant for installing, maintaining and servicing plant equipment." Underground concludes "[t]he crane thus becomes a part of the pumping plant structure." Finally Underground asks the court to infer from this that the test weights are part of the concrete required for the pumping plant structure.

Plaintiff's logic is too tenuous. The court finds that, giving the words in the specifications their ordinary and commonly accepted meaning, plaintiff's interpretation is unsupportable. *See Hol–Gar Manufacturing Corp.,* 169 Ct.Cl. at 390, 351 F.2d at 976. A contract may be construed against the Government where it is ambiguous and the contractor's proposed interpretation is reasonable. *See United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir. 1987) (citing *Santa Fe Engineers, Inc. v. United States,* 801 F.2d 379, 381 (Fed.Cir. 1986)). However, " '[t]he fact that, by giving words strained or unusual connotations, a certain interpretation might or could be considered is not a proper basis for the application of the rule.' " *Dittmore–Freimuth Corp. v. United States,* 182 Ct.Cl. 507, 535, 390 F.2d 664, 682 (1968) (quoting *Jefferson Constr. Co. v. United States,* 151 Ct.Cl. 75, 84 (1960)).

The contract called for construction of a pumping station. While the test weights may be used inside the structure itself, they are not part of or appurtenant to it. They are separate items; unattached; used only for testing the crane. The court finds plaintiff's argument that the weights became part of the structure to be outside the zone of reasonableness. Consequently, application of the doctrine of *contra proferentum* is inappropriate. *Turner Constr. Co.,* 819 F.2d at 286; *ITT Gilfillan, Inc. v. United States,* 200 Ct.Cl. 367, 380, 471 F.2d 1382, 1390 (1973); *see Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 495, 346 F.2d 962, 972 (1965) (citing *WPC Enterprises, Inc. v. United States,*

163 Ct.Cl. 1, 6–7, 323 F.2d 874, 876–77 (1963)).

The court finds further, that defendant's directive to build the weights according to general concrete specifications does not change the result. The general concrete provisions, particularly Section 6.3, provide extensive technical information regarding the placement of concrete. It contains subsections such as Admixtures, Batching, Mixing, Temperature of Concrete, etc. The fact that the government referred plaintiff to these specifications in response to questions regarding building of the concrete test weights is not surprising. These specifications would logically be referred to in response to any question regarding concrete. However, nothing supports the notion that reference to these specifications suggests concrete in the test weights can be reasonably classified as concrete in structures as that term is defined by specification section 6.2. The test weights are not mentioned anywhere in these sections.

In sum, the court finds there is no uncertainty in the contract language regarding payment for the test weights, and that the contract requires that they be included in the lump-sum bid item for furnishing and installing the crane. Furthermore, plaintiff's proposed alternative interpretation is unreasonable in any case. Plaintiff's claim must therefore fail.

## CONCLUSION

With respect to Count III, plaintiff's Motion for Summary Judgment is granted; defendant's is denied. Defendant's Motion for Summary Judgment is granted with respect to Counts XIII and XIV. Plaintiff's motion as to those counts is denied.